# **EXHIBIT A**

Hearing Date: 1/11/2023 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
9/13/2022 9:22 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09018
Calendar, 7
19461383

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| BUXTON, SLOANE,<br>Individually and on behalf all others similarly situated, | ) | |
| | ) | No. 2022CH09018 |
| Plaintiff, | ) | |
| | ) | Class Action |
| v. | ) | |
| | ) | Cal./Rm. |
| 1237 FULLERTON LLC and<br>THE SCION GROUP LLC, | ) | Judge: |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, Sloane Buxton, individually and on behalf of all others similarly situated, ("Plaintiff") by and through Plaintiff's attorneys, JS Law, states as follows for Plaintiff's Complaint against Defendants, 1237 Fullerton LLC and The Scion Group LLC (herein collectively referenced as "Defendants").

**INTRODUCTION**

1. This is a class action against Defendants for violating the City of Chicago Residential Landlord and Tenant Ordinance, Municipal Code Title 5, Chapter 12, *et seq.* ("RLTO"). As more fully explained below, Defendants violated Section 5-12-140 of the RLTO by attempting to enforce provisions in their rental agreement prohibited by the RLTO. The prohibited rental agreement provisions are the mandatory arbitration and class action waiver provisions provided by paragraph 30 of Plaintiff's and the class's standard form written rental agreements. Defendants' attempt to enforce the prohibited lease provisions was their filing of their "Defendants' Motion to Compel Individual Arbitration, Dismiss Plaintiff's Class Claims, and Stay All Proceedings" in Cook County Circuit Court case number 2022-CH-04059 on July

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

13, 2022. RLTO 5-12-140 both prohibits mandatory arbitration and class action waiver clauses to be included in written rental agreements for a dwelling unit in Chicago, Illinois, and provides for statutory damages in favor of tenants if a landlord attempts to enforce such prohibited rental agreement provisions.

**THE PARTIES**

2. At all times relevant Plaintiff resided in Chicago, Cook County, Illinois.

3. Defendant 1237 Fullerton LLC is an Illinois company registered with the Illinois Secretary of State. 1237 Fullerton LLC is the owner of the multi-story residential apartment building located at 1237 West Fullerton Ave., Chicago, IL 60614, commonly known as Ion Lincoln Park.

4. Defendant The Scion Group LLC is an Illinois company registered with the Illinois Secretary of State. The Scion Group LLC is the property manager of Ion Lincoln Park. The website for The Scion Group LLC, thesciongroup.com/about/, states in 2021:

> Scion becomes the global leader in purpose-built, off-campus student housing, operating 117 communities in 72 campus markets. The team of over 1,700 employees serves nearly 77,000 residents across the United States.

5. All Defendants are landlords of Plaintiff and the putative class as defined by the RLTO during the relevant timeframe.

**JURISDICTION AND VENUE**

6. Jurisdiction and venue are proper in this Court because this action arose out of: (i) business transacted by Defendants in Cook County, Illinois and (ii) violations of Chicago municipal ordinances in Cook County, Illinois.

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

## FACTS COMMON TO ALL COUNTS

7. On April 1, 2022, Defendants offered Plaintiff the written rental agreement, titled "Housing Agreement," for a dwelling unit in Ion Lincoln Park (hereinafter "Ion") located in Chicago, Illinois. The Housing Agreement is attached hereto as **Exhibit 1**.

8. Ion is a six story (although the first level is commercial) residential dwelling unit building that occupies an entire length of a city block. The Ion is marketed to students of DePaul University as off campus housing for students. The apartments that comprise Ion are offered to students on a per person / per bedroom basis. An Ion marketing and pricing brochure is attached hereto as **Exhibit 2**. As such, likely thousands, but at least hundreds, of college student tenants are subject to the standard form Housing Agreement at issue in this matter.

9. The Housing Agreement defines "Rent" as "a fixed price for the entire Term" and "there is no proration or adjustment for any partial month." In other words, one month's rent is the same amount as 12 months of rent. Accordingly, as drafted by Defendants, pursuant to the Housing Agreement, Plaintiff's monthly rent amount was $13,536.00.

10. The Housing Agreement is a standard form written residential rental agreement.

11. The Housing Agreement was offered electronically and signed electronically. The last two pages of the Housing Agreement is a document titled "Signature Detail" that provides the exact date and time Plaintiff and Defendants signed the Housing Agreement.

12. The standard form verbiage "SEE BELOW FOR ELECTRONIC SIGNATURE" on the first page of the Housing Agreement evidences Defendants' standard practice of offering the Housing Agreement electronically to prospective tenants.

13. The Housing Agreement by its terms and substance evidences governance by the RLTO, including but not limited to:

FILED DATE: 9/13/2022 9:22 AM    2022CH09018

(i)      The provision at paragraph 2 that limits the late fee as required by RLTO 5-12-150(h) to "$10 for the first $500 of any unpaid balance plus 5% of any additional amount of unpaid balance beyond $500;"

(ii)     The provision at paragraph 21, which states: "AS PROVIDED IN CHICAGO RESIDENTIAL LANDLORD-TENANT ORDINANCE SECTION 5-12-130(j), OWNER HEREBY PROVIDES NOTICE…";

(iii)    The provisions at paragraph 30(c) that exclude from binding arbitration "injuctive remedies provided under applicable landlord-tenant laws;"

(iii)    The provision at paragraph 31, which states: "Resident acknowledges receipt of summaries of the Chicago Residential Landlord and Tenant Ordinance, included on pages 10-14; and

(iv)    Attached to the Housing Agreement as pages 10-15 was (a) the summary of the general terms of the RLTO prepared by the City of Chicago in 2020 and also (b) the separate summary of the interest rate provisions of the RLTO describing the respective rights, obligations and remedies of landlords and tenants with respect to security deposits prepared by the City of Chicago in 2020 (the "2020 Interest Rate Summary").

14.    The Housing Agreement includes a paragraph titled "Dispute Resolution: Mandatory Arbitration: Class Action Waiver" (the "Arbitration Clause") at paragraph 30 of the Housing Agreement (the "Arbitration Clause" with emphasis added, is attached hereto as **Exhibit 3** with emphasis added).  As the title suggests, the provisions of the Arbitration Clause waive the right of any party to a trial by jury and prohibit the tenant from participating in a class wide arbitration.

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

15. The Arbitration Clause defines the claims subject to arbitration as the "Claims" (See, 30(a)) and then the class action waiver provision provides the "CLAIMS WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS" (*See*, 30(f)). Accordingly, claims that are not subject to arbitration are expressly excluded from the definition of "Claims" and are therefore also not subject to the class action waiver provision. See, 30(a) of the Arbitration Clause stating "Except [the excepted claims] expressly provided below … [claims arising from the Housing Agreement are defined as "Claims"].

16. The Arbitration Clause at Paragraph 30(c) excludes from the Arbitration Clause "an action … for injunctive remedies provided under applicable landlord-tenant laws" and "any claim or dispute for which applicable law (as determined by a binding court decision) or the applicable arbitration rules do not permit arbitration and require adjudication in a specific civil court"). "Applicable law" is specified at Pargraph 30(e) as "the internal laws of the State of Illinois."

17. On April 29, 2022, Plaintiff filed a complaint (the "5-12-170 Complaint") against Defendants on behalf of herself and a putative class of similarly situated individuals in the Circuit Court of Cook County that was premised on the Housing Agreement and its non-compliance with Section 5-12-170 of the RLTO. That lawsuit was assigned the case number 2022-CH-04059. Concurrent with the filing of the 5-12-170 Complaint, Plaintiff also filed a motion for class certification. The motion for class certification was entered and continued on June 2, 2022.

18. The remedy sought by the 5-12-170 Complaint was for both monetary relief and injunctive relief, specifically, Plaintiff requested the court to "Enter judgment for Plaintiff and the Ordinance Summary Class against Defendants for the amounts specified in §5-12-170 of the

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

RLTO" and "Order Defendants to permit Plaintiff and the Ordinance Summary Class to terminate their rental agreements by written notice as provided by §5-12-170 of the RLTO" (Complaint, P. 30.)

19. On July 13, 2022, in response to the class action complaint in lawsuit 2022-CH-04059, Defendants filed their "Defendants' Motion to Compel Individual Arbitration, Dismiss Plaintiff's Class Claims, and Stay All Proceedings" (hereinafter "Motion to Compel"). The Motion to Compel sought to enforce the Arbitration Clause, including the waiver of jury trial provision. The prayer for relief sought by the Motion to Compel is "to compel individual arbitration, dismiss the class claim, and stay proceedings pending the completion of arbitration." The Motion to Compel is attached hereto as **Exhibit 4**.

20. The Motion to Compel is an attempt to enforce the prohibited lease provisions provided by the Arbitration Clause, and it is an actionable violation of RLTO 5-12-140 that entitles every putative class member of case 2022-CH-04059 to statutory damages in the amount of two times the amount of rent stated in each of their Housing Agreements.

21. The rights and interests of the putative class members of 2022-CH-04059 are targets of the Motion to Compel the same as Plaintiff since, in addition to other reasons, the interests of the absent class members were before the court pursuant to the pending motion for class certification in case 2022-CH-04059 and the prayer for relief expressly sought to "dismiss the class claim."

## CLASS ALLEGATIONS

22. Plaintiff brings this action individually and on behalf of a class of others similarly situated. This action may properly be maintained as a class action pursuant to the provisions of 735 ILCS 5/2-801.

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

23. Plaintiff' proposed class is designated as the "Prohibited Lease Provision Class."

24. The Prohibited Lease Provision Class consists of the all persons who satisfy the following criteria:

a. They were a member of the alleged putative class provided by the 5-12-170 Complaint and corresponding motion for class certification in the lawsuit 2022-CH-04059, captioned *Sloane v. 1237 Fullerton LLC et al*., pending in the Circuit Court of Cook County as of July 13, 2022 (the date Defendants filed their Motion to Compel) who had executed the Housing Agreement;

b. Their executed Housing Agreement included the Arbitration Clause; and

c. Defendants attempted to avoid liability to them and enforce the provisions of the Arbitration Clause included in the Housing Agreement by the filing of Defendants' Motion to Compel.

25. Class members including hundreds, and likely thousands, of tenants, such that individual joinder of all members is impractical.

26. Common questions of law and fact exist as to all class members and predominate over any questions that affect only individual class members. The questions of law and fact that are common to the Prohibited Lease Provision Class and that predominate include, but are not limited to:

a. Whether Defendants' standard form written rental agreement, the Housing Agreement, included the Arbitration Clause;

b. Whether the Arbitration Clause was prohibited by the RLTO; and

c. Whether Defendants attempted to enforce the Arbitration Clause when they filed their Motion to Compel.

27. Plaintiff will fairly and adequately protect the interests of the class in that Plaintiff' claims are typical of those classes and Plaintiff do not have any interests which are adverse to the other class members.

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

28.     Plaintiff has retained competent counsel experienced in handling class actions and actions involving violations of the RLTO. Neither Plaintiff nor Plaintiff's counsel have any interests which might cause them not to vigorously prosecute this action.

29.     Plaintiff's claims are based on similar facts and the same legal theories as those of the class members.

30.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence and effort.  Class treatment is especially appropriate for the current controversy because it is the only practical means for class members to receive redress given that the individual claims are small in amount and they are unsophisticated college-aged students.

**COUNT I**
**ATTEMPT TO ENFORCE PROHIBITED LEASE PROVISION**
**IN VIOLATION OF RLTO 5-12-140**

31.     Plaintiff repeats and realleges Paragraphs 1-30 as Paragraph 31, and states that this Count is brought by Plaintiff individually and on behalf of the Prohibited Lease Provision Class.

32.     Section 5-12-010 of the RLTO provides: "this chapter applies to, regulates and determines rights, obligations and remedies under every rental agreement for a dwelling unit located within the City of Chicago, regardless of where the agreement is made."

33.     The Housing Agreement is a rental agreement for a dwelling unit located within the City of Chicago. Accordingly, the Housing Agreement is governed by the RLTO.

34.     Section 5-12-140 of the RLTO provides:

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

Except as otherwise specifically provided by this chapter, no rental agreement may provide that the landlord or tenant:

(a) Agrees to waive or forego rights, remedies or obligations provided under this chapter;

(b) Authorizes any person to confess judgment on a claim arising out of the rental agreement;

(c) Agrees to the limitation of any liability of the landlord or tenant arising under law;

(d) Agrees to waive any written termination of tenancy notice or manner of service thereof provided under state law or this chapter;

(e) Agrees to waive the right of any party to a trial by jury;

(f) Agrees that in the event of a lawsuit arising out of the tenancy the tenant will pay the landlord's attorney's fees except as provided for by court rules, statute, or ordinance;

(g) Agrees that either party may cancel or terminate a rental agreement at a different time or within a shorter time period than the other party, unless such provision is disclosed in a separate written notice;

(h) Agrees that a tenant shall pay a charge, fee or penalty in excess of $10.00 per month for the first $500.00 in monthly rent plus five percent per month for any amount in excess of $500.00 in monthly rent for the late payment of rent;

(i) Agrees that, if a tenant pays rent before a specified date or within a specified time period in the month, the tenant shall receive a discount or reduction in the rental amount in excess of $10.00 per month for the first $500.00 in monthly rent plus five percent per month for any amount in excess of $500.00 in monthly rent.

A provision prohibited by this section included in a rental agreement is unenforceable. The tenant may recover actual damages sustained by the tenant because of the enforcement of a prohibited provision. If the landlord attempts to enforce a provision in a rental agreement prohibited by this section the tenant may recover two months' rent.

35. The Arbitration Clause is prohibited by Section 5-12-140 (a), (c) and (e) of the RLTO.

36. Defendants violated Section 5-12-140 of the RLTO when they attempted to enforce the Arbitration Clause by filing the Motion to Compel in the lawsuit 2022-CH-04059.

37. As the result of Defendants' attempt to enforce the provisions of the Housing Agreement prohibited by RLTO 5-12-140, Defendants are liable to Plaintiff and the Prohibited Lease Provision Class in the amount of two months' rent.

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

38. As required by the Housing Agreement as drafted by Defendants, one month rent is the "fixed price for the entire Term;" therefore, two months' rent is two times the "fixed price for the entire Term."

39. The penalty of two times "rent" as defined by the Housing Agreement may at a glance seem unfair, but it isn't considering that Defendant Scion is the global leader in purpose-built, off-campus student housing, operating 117 communities in 72 campus markets, and it was Defendants and their team of sophisticated attorneys with their disproportionate bargaining power that drafted the Housing Agreement to include such a unique provision that would financially ruin any unsophisticated college-aged student that signed the agreement and attempted to terminate the agreement early.

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests this Court to:

a. Certify the Prohibited Lease Provision Class;

b. Appoint the named Plaintiff as class representative of Prohibited Lease Provision Class;

c. Appoint JS Law as class counsel;

d. Enter judgment for Plaintiff and the Prohibited Lease Provision Class against Defendants for the amounts specified in §5-12-140 of the RLTO;

e. Award attorney's fees, litigation expenses and costs as specified in §5-12-180 of the RLTO; and

f. Order such other further relief as the Court deems equitable, including but not limited to prejudgment interest.

Dated: September 13, 2022

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

Respectfully submitted,

SLOANE BUXTON, individually and on behalf of all others similarly situated,

By: */s/ Jeffrey Sobek*
One of Plaintiff's attorneys

Firm No. 48317
JS Law
29 E. Madison Street, Suite 1201
Chicago, Illinois 60602
Telephone (312) 756-1330
jeffs@jsslawoffices.com



FILED
9/13/2022 9:22 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09018
Calendar, 7
19461383

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# HOUSING AGREEMENT

This Housing Agreement is entered into on **Apr 01, 2022**, between **Sloane C Buxton** **("Resident")** and **1237 Fullerton LLC**("**Owner**") and is binding only when signed by Owner or its agent.

**NUMBER OF BEDROOMS: 1**

**Start Date:** September 01, 2022 **Unit Type: 4 BEDROOM, 2 BATH**

**End Date:** August 10, 2023 **Initial Apartment/Bedroom #:** TBA

**Housing Installment Rate** **$1,029.00**

**Utility/Amenity Fee** **$99.00**

**Payment Schedule:**

**12 payments of $1,128.00 each, due on the dates shown in paragraph 2**

**Total Rent:** **$13,536.00**

**Administrative Fee:** **$300.00** **Security Deposit:** **None**

Owner's address (including for payment, service of process and notices): **1237 West Fullerton Ave., Chicago, IL 60614**. The "person" authorized to enter into rental agreements on behalf of Owner, to manage the Property and to act for and on behalf of the Owner for the purpose of service of process and of receiving and receipting for notices and demand is the Manager: The Scion Group LLC, 1237 W. Fullerton Ave., Chicago IL 60614, 773-395-4500.

This Housing Agreement grants a limited license to Resident to access and make personal residential use of one (1) assigned bedroom space (unless multiple bedrooms are expressly listed above, as further described in paragraph 29) in an apartment (and adjoining bathroom if applicable), together with its standard installed fixtures and furnishings, plus shared use of accompanying unit common areas, fixtures, furnishings and appliances in the assigned apartment, at the residential property known as "**Ion Lincoln Park**," located at 1237 W. Fullerton Ave., Chicago, Illinois (the "**Property**") between the Start Date and End Date listed above. This Housing Agreement is not a lease and no tenancy, leasehold, possessory or other property interest in any specific apartment or bedroom is created. Resident is initially assigned to the bedroom space and apartment identified above (see floor plan available in the management office or at ion-lincolnpark.com for designation of bedroom spaces); if the space is not immediately identified or assigned, or if it is identified as "to be assigned," "TBD" or "TBA," this Agreement is binding and Owner will assign an apartment and bedroom matching the identified unit type prior to move-in. Resident will occupy only the assigned bedroom space within the apartment. Resident will not allow another person to use a bedroom space or apartment in place of or in addition to Resident, whether for compensation or otherwise, and will not offer to do so through advertising or listings. Owner will attempt to assign the other bedroom(s) to person(s) requested by Resident but may contract with others of Owner's choosing for the other bedroom(s) within the apartment, without notice to Resident. If this Housing Agreement is executed by more than one person identified as "Resident," then all obligations are the joint and several obligations of all such persons and "Resident" will refer to all such persons both individually and collectively. **This Housing Agreement includes the terms below and continues through page 15, including arbitration provisions contained in paragraph 30.**

*Note: Resident agrees to provide any one of the following within seven days after signing and prior to move-in (or, if Resident is already in possession of the bedroom space, then prior to the Start Date): (1) a signed Guaranty by a Guarantor acceptable to Owner, (2) a guaranty policy purchased from a third-party provider approved by Owner, or (3) prepayment of the final two installments indicated above. This obligation is an element of Resident's performance and not a condition precedent. Failure to provide one of the above will not release Resident from financial responsibility but will entitle Owner, at its option, to delay move-in or terminate for non-performance, following written notice.*

**I, as Resident, have carefully read and fully understand and voluntarily sign this Housing Agreement and acknowledge that once fully signed, this is a binding contract upon me and all permitted successors.**

SEE BELOW FOR ELECTRONIC SIGNATURE
**Signature of Resident**

**ACCEPTANCE BY OWNER:**

**1237 FULLERTON LLC**

**By:** SEE BELOW FOR ELECTRONIC SIGNATURE
**Its Authorized Agent**

**This Housing Agreement ("Agreement") includes the following terms:**

1. **Term**. Resident will have access to the Property and the assigned bedroom space and apartment as of 10:00 A.M. on the Start Date, and this access will end as of 12:00 Noon on the End Date (the "**Term**"), unless early arrival or late departure is approved by Owner in writing, at additional cost to the Resident.

1 Sloane C Buxton 16 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

2. **Payment.** Resident accepts financial responsibility for the full Term of the Agreement, regardless of whether the assigned bedroom space is occupied for the full Term or at all. Resident agrees to make full and prompt payment to Owner according to the payment schedule specified below, without demand of Owner. Payment for unpaid utility charges and any other charges then lawfully due may at Owner's option be made part of rent and due and payable together with rent. **The Total Rent stated above is a fixed price for the entire Term and is payable in equal installments for convenience; there is no proration or adjustment for any partial month.** Payment may be made by personal check, money order or cashier's check, or in Owner's discretion by credit card, check card, electronic check, or by direct bank transfer, provided that (i) Owner reserves the right to charge processing fees for such payment methods, and (ii) if payment of the first regular installment is not received at least three business days prior to move-in, Owner may require this payment be made with certified funds. If any payment is returned unpaid, Owner may require Resident to make future payments by certified funds. Payment (including by mail) is deemed made only when actually received by Owner or its agent, subject to clearance of funds. Resident's payment obligation is a promise by Resident which is independent from all of Owner's and its agent's promises, duties and obligations. Each payment not received within two calendar days after the date due will be increased by **a late charge of $10 for the first $500 of any unpaid balance plus 5% of any additional amount of unpaid balance beyond $500.** To cover Owner's added costs for processing of payments that are dishonored or returned due to insufficient funds or other reason, each such payment will be increased by $35 as a returned payment charge and will not be considered paid until valid payment has been received. Acceptance by Owner of any payment shall not constitute a waiver of Owner's right to terminate this Agreement and/or claim any damages.

Payment will be due without proration as follows:

| | | | |
|---|---|---|---|
| 1st day of September 2022 | $1,128.00 | 1st day of March 2023 | $1,128.00 |
| 1st day of October 2022 | $1,128.00 | 1st day of April 2023 | $1,128.00 |
| 1st day of November 2022 | $1,128.00 | 1st day of May 2023 | $1,128.00 |
| 1st day of December 2022 | $1,128.00 | 1st day of June 2023 | $1,128.00 |
| 1st day of January 2023 | $1,128.00 | 1st day of July 2023 | $1,128.00 |
| 1st day of February 2023 | $1,128.00 | 1st day of August 2023 | $1,128.00 |

3. **Assignments.** Apartment and bedroom space assignments are made, and may be changed, only by Owner or its agent. **Change requested by Resident:** Resident may request to change assignments to a different apartment. Such change requests by the Resident are only effective upon written approval by Owner in its discretion, subject to the following preconditions: (a) Resident must be in good standing under the Housing Agreement; (b) Resident must prepay a $200 reassignment fee (refunded if the request is declined); (c) Resident and Owner must sign a written confirmation of the change in assignment, including Resident's agreement to pay the prevailing rate for the new assignment, pro-rated to the date scheduled for relocation; and (d) relocation must be completed within 48 hours or charges will apply on both spaces. **Change by Owner:** Owner reserves the right to relocate Resident to another equivalent bedroom space or apartment at the Property for any reason upon at least three days' notice. In such case, if the new Owner-assigned space carries a lower rate, Resident's charges will be pro-rated and reduced accordingly; if the new Owner-assigned space carries a higher rate, Resident will continue to pay the rate under this Agreement and will not be charged the higher rate. Failure to relocate within the time provided by Owner will be considered a material breach and may also result in charges applying for both spaces.

4. **Termination; Subletting/Delegation.** Once this Agreement is signed by Owner and Resident, Resident may terminate by providing written notice to Owner and by fully vacating the premises, provided that **in all cases Resident will remain fully responsible for the Total Rent that would have accrued under this Agreement, through the end of the full original Term**. No exception can be made for financial hardship, academic changes, family matters, medical issues, roommate conflict or any other reason. Any charges associated with damage to a bedroom space, apartment or the Property or Resident's failure to vacate completely upon termination, will be payable in addition to the foregoing amount. After such termination, Owner will use its commercially reasonable efforts to contract with other individuals for the use of all available bedroom spaces, including the bedroom space vacated by Resident; if and when all such available bedroom spaces at the Property are fully assigned and occupied and no bedroom spaces remain vacant, Resident will receive a credit equal to the remaining charges that would have accrued under this Housing Agreement, prorated from such date through the end of the original term hereof, less a $200 cancellation/marketing fee which is in addition to all other charges provided herein. Resident understands that due to the nature of student housing, successful mitigation is highly unlikely; therefore, Resident will be responsible for remaining scheduled rent, subject to potential credit for mitigation as described above, and Owner may apply all prepaid amounts (if any) toward Resident's obligation. Resident may not assign or transfer Resident's interest in this Agreement, or any part hereof, nor sublet Resident's right to use the Property, apartment or bedroom space, or any part thereof, nor provide keys to any other person. However, in Owner's sole discretion, Resident may delegate his or her right to use the Property to another person pursuant to Owner's

[2] Sloane C Buxton [17] Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

approved delegation form, signed by all parties, if Resident is in good standing under the Agreement and pays to Owner a delegation fee of $200.

5. **Move-in; Inspection; Delay.** Before Resident may access or occupy the premises, all required administrative fees, other annual charges and all installments then due must be paid in full with cleared funds and guaranty requirements satisfied. Immediately preceding Resident's taking possession of the assigned bedroom space (and any re-assigned bedroom space), Resident will conduct an inspection of the assigned bedroom space and apartment and will note on the Check-In/Check-Out Inspection Report ("Inspection Report"), which upon completion and approval by Owner will become part of this Agreement, any defects, damage or other conditions observed. Owner's approval of the Inspection Report will be conclusive evidence of existing defects, damage and conditions and of a full inventory of fixtures. If Resident fails to conduct the inspection and/or provide a signed Inspection Report to the Owner, then Resident waives the right to dispute any assessment of damages to the bedroom space and/or apartment on the basis of a pre-existing condition. Upon Resident's move-out (or, as applicable, following the move-out of all residents of an apartment) at the termination of this Agreement, Owner will note the then-present condition of the assigned bedroom space and apartment, including all appliances and fixtures, and any damages incurred and/or extraordinary cleaning deemed necessary by Owner or extraordinary wear as determined by Owner. Resident will promptly pay all costs of restoring the bedroom space and apartment to the same condition upon move-in, less normal wear, and is encouraged to inspect the bedroom space and apartment with Owner's representative prior to move-out by making an appointment during business hours at least two days in advance. Resident acknowledges that except as provided in the Inspection Report, each bedroom space and apartment are being delivered in "as-is" condition, and Resident's acceptance of the assigned bedroom space and apartment at the beginning of the Term constitutes Resident's acknowledgment that the bedroom space and apartment and all fixtures are in good repair and condition. Owner will not be responsible for any damages or consequences suffered by Resident as a result of Owner's inability to timely deliver possession of an apartment or bedroom space to Resident on the anticipated Start Date; in such event, the rent payable will be abated until Owner renders possession and such delay will not extend or decrease the term or change the End Date. If such delay extends beyond 30 days, Resident may terminate this Agreement upon written notice to Owner.

6. **Required Liability Insurance; Personal Property**. During the full term of the Housing Agreement, Resident agrees to obtain and maintain at Resident's expense a policy of personal liability insurance (i.e., renter's liability insurance) from a licensed insurance carrier in the United States, with coverage of at least $100,000 per occurrence at actual replacement cost, covering Owner's losses of any kind arising from fire, smoke or water and caused by Resident's negligence and/or by Resident's animal. The liability insurance requirement and the existence or limits of any such insurance will not reduce or supersede Resident's obligations under this Housing Agreement, except to the extent Owner charges and Resident pays for a waiver of this insurance requirement as provided below. Resident is not obligated to purchase insurance from any specific provider and may arrange its own personal liability insurance policy from any insurer of Resident's choosing meeting the requirements of this paragraph, in which case Resident agrees to provide written proof of the required personal liability insurance coverage, including causing Owner and Manager to be listed as named interested parties on such insurance coverage, by mailing the proof of insurance to P.O. Box 18999, Atlanta, GA 31126-1399. Owner will provide instructions prior to move-in for submitting proof of insurance or purchasing a compliant insurance policy; Resident's failure to comply with these insurance requirements will be a breach by Resident with Owner reserving its remedies but will not give Resident any right of termination. If Resident fails or chooses not to provide sufficient proof of compliant personal liability insurance to Owner by the Start Date, or if Resident's insurance is cancelled during the term of this Housing Agreement, then Owner may, at its option, waive Resident's obligation to provide such insurance and obtain its own coverage in Owner's name for the same limited risks (up to $100,000 per occurrence from fire, smoke or water damage caused accidentally by Resident's negligence and/or by Resident's animal) at Owner's expense; in such case, Resident agrees to reimburse Owner at the cost of $12.00 per installment as additional Rent during the remaining term of this Agreement, of which Owner will retain $5.00 per installment as an administrative fee and use the remaining $7.00 per installment to procure such insurance for itself. This waiver is not insurance, does not release Resident from liability for other damage or causes and does not cover Resident's personal property. Owner strongly recommends that Resident maintain insurance covering Resident's personal property or belongings, which Resident may elect to purchase. Neither Owner nor any of its employees, representatives or agents assumes any liability, directly or indirectly, for loss or damage to the personal property of Resident or others by fire, theft or any other cause. Any personal property remaining in the bedroom space and/or apartment at the end of the Term or after earlier termination of this Agreement will be considered abandoned by Resident and may be disposed of by Owner at the risk and expense of Resident, with Owner maintaining a landlord's lien for unpaid rent as provided by law. Owner will not be liable or responsible for storage or disposition of the Resident's personal property. If there are multiple individuals comprising Resident, then all references to and obligations of Resident in this paragraph 8 will apply to each such individual, separately.

7. **Responsibility for Damage. Resident is solely responsible for any damage, defacement or loss within the assigned bedroom space. All assigned residents of an apartment are jointly and severally responsible for any damage, defacement or loss to common areas, other parts of the facility, fixtures or appliances, except for the portion of damages over $100,000 where it is finally established that Resident or one or more other residents of the apartment were solely at fault for the entire loss, in which case such person(s) will be solely responsible.** Resident is fully responsible for the conduct of Resident's guests, visitors, licensees and invitees ("Guests"), including without limitation harm to individuals or damage or defacement of

[3] Sloane C Buxton [18] Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

any part of the Property or its fixtures or property of third parties (including other residents) by such Guests. **All loss or damage in connection with any fire arising from or contributed to by the negligence or intentional act of Resident or his/her Guests will be the sole responsibility of Resident, regardless of insurance coverage or any applicable deductible.**

**8. Prohibitions.** Firearms, weapons, explosives or illegal drugs of any kind are strictly prohibited anywhere on or about the Property, including individual apartments and bedroom spaces (except government-issued service weapons carried by duly deputized law enforcement personnel). No gas or charcoal grill, nor any other open flame cooking or heating device, may be stored or used on any balcony, deck and/or patio at the Property, except on the ground at least 25 feet from any building. Resident will, and will cause Guests to: (a) comply with all federal, state, county and city laws, ordinances and/or regulations, including without limitation those relating to the consumption of alcoholic beverages; (b) not act in any way that endangers the Property or the safety of any person, or that is intended to facilitate criminal activity; (c) not engage in disruptive conduct or allow any noise loud enough to be heard outside the apartment or in neighboring apartments assuming doors and windows were closed; (d) not place or keep any trash outside of the apartment, including on any balcony, deck or patio; (e) not damage or take any property belonging to others without express consent; (f) not tamper or interfere with smoke detectors; (g) not injure the reputation of the Property or its residents, (h) not act or fail to act in any way that would cause an increase in the rate of insurance at the Property; (i) not engage in any activity which interferes with or decreases the use and enjoyment of the Property by other residents; and (j) otherwise obey the Community Policies and other rules applicable to the Property. Any single violation of any of the foregoing will be considered a material breach of this Agreement and will be good cause for immediate termination of the Agreement with all applicable charges due.

**9. Cleanliness; Heat; Safety; Entry.** Resident agrees to maintain the assigned bedroom space, the apartment and the common areas of the Property in a clean, safe and sanitary condition, to exercise all due care in the use of same, and to cooperate fully with the Property pest control program as requested. Resident will be responsible for the cost of treatment for bedbugs and similar pests to the extent Owner's pest control vendor reasonably determines that an infestation has originated within Resident's assigned space and during Resident's occupancy. Resident will place all trash in provided receptacles and will be responsible for the cost of cleaning the interior or exterior of the apartment if not kept in sanitary condition. Resident will at all times during cold weather keep the apartment's heat turned on, including during vacations, and will otherwise ensure that the apartment and bedroom space are heated sufficiently to at least 60ºF to prevent damage from freezing, including but not limited to frozen pipes and fixtures. Resident will be responsible for all damage anywhere at the Property resulting from failure to keep the apartment and/or bedroom space adequately heated. Owner and its agents, employees and contractors may enter any apartment and bedroom space to perform routine maintenance, inspections, showings and other ordinary functions as permitted by law, provided that Owner will attempt to provide at least two days advance notice to residents of an apartment before such entry (except for repairs performed upon request by any resident of the apartment, in which case advance notice is not required). Owner reserves the right to enter an apartment and any bedroom space without prior notice (including use of a passkey or other means of entry if locks have been changed) for emergency maintenance or repair purposes, or when there is reasonable cause to believe that a situation exists that could cause danger to life, safety, health or property. Owner may remove any item reasonably deemed to cause danger and is under no obligation to pay compensation for or to return such items.

**10. Residential Use; No Pets.** The bedroom space and apartment may be used solely for private residential purposes and for no other purposes. Resident may not carry on any business or other enterprise from the bedroom space or apartment, nor use any assigned phone number or Internet connections for business purposes. Resident may place no signs, placards or other advertisement of any character in the bedroom space or apartment, nor display anything in an apartment or bedroom space that is visible from outside the Property or the apartment. Resident may not store at the Property or connect to a Property electrical outlet any mobility device owned by a third party. No pets are allowed anywhere in or about the Property, except fish in small tanks to the extent approved by Owner in its sole discretion. Violation of the no-pet policy will subject Resident to mandatory deep-cleaning fees and may be considered as a termination of this Agreement by Resident, with all charges due and accelerated (to the extent permitted by law) as provided in paragraph 4.

**11. Utilities; Amenities.** The following utilities are included in the Total Rent set forth in this Agreement: **Electricity, water/sewer, gas, Internet access, emergency local phone and trash disposal**. Owner makes no representations and hereby disclaims any and all warranties, express or implied, with respect to any utilities provided, including but not limited to those warranties concerning merchantability and fitness for a particular purpose or use, whether made allegedly by Owner or its representatives or agents, whether in writing or otherwise, except as otherwise expressly stated in this Agreement. Owner does not warrant or guarantee the protection of Resident's privacy during operation of utilities, that such utilities will satisfy Resident's requirements, or that the operation of utilities will be uninterrupted or error free. Resident acknowledges and agrees that neither Owner nor its affiliates, agents, employees or representatives will be responsible to Resident for any non-economic, consequential, incidental, indirect or special damages, including incidental, economic or punitive damages, arising from breach of warranty, breach of contract, negligence or any other legal ground of action, or by reason of the use, discontinuation or modification of any utilities or the termination of any utilities, whether arising from Resident's use of (or inability to use) utilities, or otherwise, even if Owner has been advised of the possibility of such damage. In the event that any utility service proves defective, or is discontinued or terminated, Owner's and Manager's entire combined liability and Resident's exclusive remedy will be limited to a reimbursement

4 Sloane C Buxton 19 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

of the approximate cost of that utility incurred by Resident, prorated by the day for each day the utility service proved defective, or was discontinued or terminated, for more than 24 hours. Resident agrees to indemnify, defend and hold harmless Owner and its employees, affiliates and agents, from any and all losses, claims, damages, expenses, other liabilities and causes of action of every nature, including attorney fees, which arise, directly or indirectly in connection with: (i) violation by Resident of any laws, ordinances, regulations or rules regarding the utilities; or (ii) illegal or inappropriate use of the utilities. Any damage or loss to any utility devices during Resident's occupancy will be charged to Resident (and the other residents in the apartment, as applicable) at the replacement cost. Management will establish schedules and policies for the use of recreation facilities, amenities and other common spaces. Owner may add, remove, close (temporarily or permanently), upgrade or modify any of the recreation facilities, amenities or common spaces in Owner's discretion, without notice or compensation; provided that if this Agreement expressly includes a separate Amenity Fee, Resident's sole remedy will be limited to a pro-rata credit of such Amenity Fee for the period a covered amenity is closed or fully unavailable.

12. **Management; Community Policies.** Owner may retain employees and management agents from time to time to manage the Property, and Owner's agent may retain other employees or contractors. Resident, on behalf of himself or herself and his or her Guests, agrees to comply fully with all directions from Owner and its employees and agents, and the policies and regulations (including all amendments and additions thereto), as contained in this Agreement and Owner's Community Policies (available at **http://ion-lincolnpark.com/policies.pdf** and incorporated by reference herein), as may be published or reasonably amended by Owner from time to time.

13. **Guests; Occupancy Limits.** No more than one person may occupy a bedroom space, except for minor children for whom the Resident is the parent or legal guardian (further subject to apartment occupancy limits), with Owner's consent and with consent of apartment-mates as applicable. If Resident desires to have an Overnight Guest (any non-resident staying in any bedroom or apartment for more than three total nights in any 30-day period), then Resident must register the Overnight Guest(s) with Owner. Resident may not have Overnight Guest(s) for more than three consecutive nights, nor for more than six total nights in any 30-day period. In the event any unregistered or unauthorized Overnight Guest(s) are identified to be in or using an apartment or bedroom space, Owner may assess against the Resident a Guest Fee of $50 per day, in addition to the right of Owner to declare Resident in material breach of this Agreement and pursue other available remedies. Although Resident may have Guests from time to time, Owner reserves the right to restrict the number of persons permitted in or about an apartment at any time in Owner's discretion, to protect safety and the quiet enjoyment of other residents. All Guests may park only in overflow parking areas and no Guest's vehicle may remain at the Property for more than three days.

14. **Parking.** If "Parking Space" is selected with a corresponding rate on page 1, Owner grants to Resident a non-exclusive, undivided limited permit to use any one marked parking spot at any given time in the Property's parking garage (subject to handicap and reserved parking restrictions) for the sole purpose of parking one personal, non-commercial vehicle, and for ordinary access to and from such parking lot over marked driveways. The parked vehicle must be properly registered and licensed and may not create a safety hazard. Vehicles improperly parked or appearing abandoned may be towed at the vehicle owner's expense. Owner will reasonably clean snow and ice from driveways but is not responsible for cleaning individual parking spaces. This paragraph creates a limited use license and not a bailment. Resident assumes all risk and responsibility for damage to the vehicle and any personal property contained in it, and the vehicles or other personal property of others, in connection with any use of parking areas. Owner is not responsible for any damage to vehicles or property contained in vehicles. Owner reserves the right to revoke or restrict parking rights if Resident violates this paragraph.

15. **Safety Precautions.** Resident acknowledges that neither Owner nor any of its agents, employees or representatives has made any representations, either written or oral, concerning the safety of the Property, the bedroom space or any apartment, or the effectiveness or operability of any security devices or safety, health or security measures at the Property, the bedroom space or any apartment. Owner neither warrants nor guarantees the safety or security of residents or their Guests against any criminal or wrongful acts of third parties. Resident and his or her Guests are responsible for protecting their own respective person and property and hereby release Owner and its agents, employees and representatives for any and all damage to person and property. Resident acknowledges that security devices or measures may fail or be thwarted by criminals or by electrical mechanical malfunctions; therefore, Resident should not rely on such devices or measures and should take steps to protect himself or herself and his or her existing property as if these devices or measures did not exist. Resident agrees to immediately notify Owner's representative of any malfunctions involving locks and life-safety building components.

16. **Smoking.** Smoking or vaping inside any apartment, hallway, elevator, breezeway, stairwell, balcony, patio or other indoor or adjacent area by Resident or his or her guest(s) is prohibited. In the event that Resident or any guest smokes, burns candles, burns incense or engages in any other activity which could result in particles and/or smoke which tend to cause staining or odor on walls, carpets or other portions of the premises, soiling of ductwork that could require duct cleaning or a persistent odor in an apartment that necessitates the removal of carpet and padding despite an apparent clean appearance, all such damage and repair cost will be considered extraordinary damage beyond normal wear and tear and is the responsibility of the Resident. Therefore, Resident agrees that **any** smoking in an apartment will subject the resident(s) to a minimum deep-cleaning fee of $250, plus any additional costs of cleaning or repair in connection with smoking or other smoke-related damage.

[5] Sloane C Buxton [20] Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

**17. Maintenance, Alteration and Repair**

(a) Resident is responsible for and agrees to take good care of the premises, fixtures and all common areas. Resident may not remove any of Owner's property and will not perform any repairs, upgrades, painting, wallpapering, electric changes or other alterations of the premises without prior written consent from Owner. Resident will be responsible for damage from waste stoppages caused by foreign or improper objects or improper use in lines serving bathrooms, damage to fixtures, appliances, doors, windows, screens, damage from water faucets left on or from doors left open, and repairs or replacements to safety devices necessitated by misuse or damage by Resident and/or guests. Extraordinary appliances or furnishings such as satellite dishes, hot tubs, pool tables, water beds or high utility-consuming devices may not be installed or placed on the premises or anywhere at the Property without Owner's prior written consent, in its sole discretion.

(b) In the case of a malfunction of any utilities or damage by fire, water or similar cause, or any water leak, suspected mold or microbial growth, electrical problem, broken glass, broken lock or any other condition that Resident reasonably believes poses a hazard to health and safety, Resident must promptly notify Owner in writing. Owner will act with reasonable time and diligence in making repairs and reconnections; Resident may not withhold or reduce payment of rent or other charges during such time. Maintenance and repair requested by Resident will generally be performed during normal business hours, unless Owner deems the work an emergency in its discretion, in which case work may take place at any time. Owner may temporarily disconnect equipment or utilities to avoid property damage and/or to perform repairs requiring such interruption, in Owner's sole discretion. Except as otherwise provided by law, Owner will not be liable for any inconvenience, discomfort, disruption or interference with Resident use of the premises because of ongoing repairs, alterations or improvements to the premises, the apartment or the Property.

(c) Following move-in, Resident is responsible for providing and changing all light bulbs and batteries (for smoke detectors and remote controls) in the assigned apartment. A written maintenance report requesting assistance in changing these items may be submitted for maintenance staff assistance, with extra charges payable by Resident as applicable per Owner's published rates. From time to time, maintenance staff may enter the assigned apartment with or without notice to inspect and change furnace filters and to provide pest control.

**18. Breach by Resident.** Upon any breach by Resident of this Housing Agreement or a prior agreement between Resident and Owner or its affiliates, including community policies, Owner may without separate demand or notice except as provided by law, and in addition to other lawful remedies, do any one or more of the following: (i) collect any charge under this Housing Agreement or community policies, including reimbursement for costs of collection; (ii) terminate this Housing Agreement and/or Resident's right to occupy the premises, and/or institute an action for eviction; (iii) sue to collect all past due charges and/or unpaid rent and other charges which would become due through the End Date or until the bedroom space and all other bedroom spaces at the Property have been filled, with recovery by Owner of any discrepancy in rent rate and any expense incurred in obtaining the new resident contract; (iv) report any information to credit reporting agencies. Without limitation, Owner may terminate this Agreement for non-payment of rent or other charges, or upon any conduct by Resident that is prohibited by or in breach of this Agreement, or if, in the reasonable judgment of Owner, continued residency will or may be detrimental to the educational process or the health, safety and/or welfare of the other residents of the Property or any of the Property's personnel. Upon any termination as described in this paragraph: (a) Resident must fully vacate the bedroom space and apartment (including removing all personal belongings) within the time provided in the written notice given by Owner, and will have no further use of or access to the Property, the assigned apartment or bedroom space; and (b) Resident will be fully responsible for all rent and other charges as if the Agreement had been terminated by Resident as described in paragraph 4. Owner's termination for breach will not limit Owner's claim for damages resulting from Resident's breach of the Agreement. Owner's acceptance of rent or other payment following notice to vacate or during the pendency of a legal action will not waive or diminish Owner's rights under this Agreement or statutory law unless separately and expressly agreed by Owner.

**19. Assumption of Risks.** Resident ASSUMES ALL RISKS associated with use of the Property and, to the full extent permitted by law, agrees to hold harmless, release, defend and indemnify Owner and its affiliates, members, partners, officers, agents and its and their respective employees ("Released Parties") from all loss, liability and/or claims for injury, illness or death to persons or damage or theft to property arising in whole or in part from: (i) the negligent acts, omissions or intentional wrongdoing of Resident or his/her Guests; (ii) fire; or (iii) the use, occupancy, presence at or other interaction with the Property or any part or contents thereof, by Resident or his or her Guests, including without limitation those injuries and damages caused by a Released Party's alleged or actual negligence or breach of any express or implied warranty. Resident agrees to indemnify each Released Party for any injuries to Resident or any Guest or other person or property that arises in connection with occupancy or use by Resident or any Guest of Resident. Resident further agrees to reimburse, indemnify and hold harmless Released Parties from any and all claims, lawsuits, actions, costs, damages (including liquidated damages as specified) or losses, including reasonable attorneys' fees and costs and expenses, that a Released Party incurs or may incur as a result of any breach of this Agreement by Resident. The forgoing will be binding to the fullest extent permitted by law and will not apply to liability of Owner specifically arising under law.

**20. Abandonment.** If the assigned bedrooms space or an apartment is abandoned, Owner may, without notice, secure the bedroom space and/or apartment with new locks, to store or dispose of any personal property left in the bedroom space or apartment by

6 Sloane C Buxton 21 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

Resident or Resident's Guests as provided by law, and to re-assign the bedroom space and/or apartment to others for use. Owner, in its sole reasonable discretion in accordance with applicable law, will have the right to determine when bedroom space and/or an apartment is abandoned, which may take into consideration any one of the following: the removal of personal property from the bedroom space other than in the usual course of continuing use, the failure to pay housing charges or other charges, discontinuance of any utility service, and failure to respond to any notices, phone calls, or correspondence from Owner or its representatives.

**21.** **Vacating at End of Term; Renewal.** This Agreement does not automatically renew, and Owner is not obligated to renew it. **AS PROVIDED IN CHICAGO RESIDENTIAL LANDLORD-TENANT ORDINANCE SECTION 5-12-130(j), OWNER HEREBY PROVIDES NOTICE OF ITS INTENT NOT TO RENEW RESIDENT'S OCCUPANCY at the end of the Term unless a new, separate Housing Agreement is mutually entered into by the parties.** Owner reserves the right to contract with others for the premises at any time, for occupancy commencing after the End Date. Upon termination or expiration of this Agreement for any reason, Resident will immediately vacate and relinquish the bedroom space and entire apartment, and all of Owner's fixtures, in a clean and sanitary condition, including removing all trash. Resident will pay all utility and service bills to the bedroom space and apartment (except those provided by Owner as specified herein) and cancel all utility accounts in the name of Resident. Resident will return to Owner all keys issued to Resident by Owner. If all keys issued to Resident are not returned promptly to Owner, Resident will pay all costs associated with re-keying or reprogramming locks for the bedroom space and/or apartment, along with the cost of replacement of keys. If Resident fails to vacate the bedroom space and apartment by the end of the Term or upon earlier termination of the Agreement, Resident will pay agreed holdover charges equal to three (3) times the daily pro-rated housing charges during the Term, plus associated expenses, including attorneys' fees as permitted by law. In no event after termination or expiration of this Agreement will it be deemed to have been renewed or extended.

**22.** **Security Deposit**. None. The parties agree (and Resident hereby acknowledges) that Owner has not charged or received any security deposit from Resident in connection with this Agreement. The Administrative Fee referenced on Page 1 of this Agreement is a non-refundable, one-time fee paid by Resident to reimburse Owner for its administrative and preparatory costs incurred in connection with this Agreement; the Administrative Fee is not intended and may not be construed to be a security deposit.

**23**. **Renewal of Residency**. If this Housing Agreement is a renewal of Resident's residency at the Property to follow the expiration of another valid agreement with an End Date that is no more than one day earlier than the Start Date of this Housing Agreement, then: (a) the Start Date of this Housing Agreement will be deemed to take place simultaneously with the expiration of the prior agreement, so that this Housing Agreement begins immediately upon the expiration of the term of the prior agreement; and (b) if Resident is assigned by Owner to a different apartment or bedroom for the new term under this Housing Agreement, Resident agrees to relocate promptly to the newly assigned space and to relinquish occupancy of the prior space on the date specified by Owner.

**24.** **Casualty Loss.** If in Owner's reasonable judgment the premises or the Property is materially damaged by fire or other casualty, Owner may terminate this Agreement within a reasonable time after such determination, by written notice to Resident, in which case Owner will refund prorated, pre-paid rent and all deposits less lawful deductions unless Resident and/or Resident's guest(s) caused the casualty, in which case all funds on account will be applied to all applicable charges related to the damages and Resident will be responsible for the balance of all charges for repairs. If following a fire or other casualty Owner does not elected to terminate this Agreement, Owner will rebuild the damaged areas within a reasonable time, and during such reconstruction, Resident will be provided a reasonable rent reduction for the unusable portion of the premises unless Resident and/or Resident's guest(s) caused the casualty. Unless Resident and/or Resident's guest(s) caused the casualty, Resident may terminate the Agreement without further obligation for rent by written notice to Owner if Owner does not return possession of the damaged areas or reasonable alternate accommodations to Resident within 60 days.

**25.** **Guarantor Information, Notice.** Owner reserves the right to notify any Guarantor of any action taken or notice given with regard to Resident under this Agreement. If Resident or Guarantor has supplied information by means of an application for residency, guaranty of payment or other documentation, Resident and Guarantor, as the case may be, represent that such information is true and correct and given voluntarily and knowingly. Owner and its management agent reserve the right to release any such information and/or Resident's account history to law enforcement, government officials, lenders and prospective purchasers of the Property.

**26.** **Subordination; Attornment**. This Agreement and Resident's rights are subject and subordinate to all present and future financings secured by the Property. Resident will attorn to the lender or any new owner of the Property following a foreclosure thereof.

**27.** **Modification.** This Agreement may not be modified, amended or revised except in writing signed by Resident and Owner or its authorized agent. If any provision of this Agreement is found to be unenforceable or inapplicable, then the remaining provisions will not be voided and will remain in full force and effect.

**28.** **Use of Likeness**. As part of the consideration for this Housing Agreement, Resident authorizes Owner and its affiliates to make photographs and video recordings of Resident in community and resident amenity areas, and irrevocably grants Owner and its

7 Sloane C Buxton 22 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

affiliates a royalty-free license to use Resident's image and likeness for all lawful purposes, including promotional purposes in advertising, video, web, social media and other formats.

**29**. **Multiple Bedroom Spaces.** If this Housing Agreement expressly identifies more than one bedroom space in a multi-bedroom apartment as assigned to Resident on page 1, then: (a) references to a "space" or "spaces" will be deemed to refer to all of the spaces assigned to Resident, or to the entire apartment if all of the bedrooms in an apartment are assigned to Resident; and (b) if Resident is assigned fewer than all of the bedroom spaces in an apartment, use of common areas will continue to be shared with other residents of the apartment and any calculation of Resident's share of any charges assessed pro rata to all residents of an apartment will be made by dividing the number of bedroom spaces assigned to Resident by the total number of occupied bedroom spaces within the apartment.

**30. DISPUTE RESOLUTION; MANDATORY ARBITRATION; CLASS-ACTION WAIVER.**

(a) Claims Subject to Arbitration. Except as expressly provided below, the parties agree that to the fullest extent permitted by applicable law, any dispute arising out of or relating in any way to this Agreement or a similar prior agreement, the Property or the relationship between Resident and Owner or Manager (including matters occurring prior to the date of this Agreement and disputes also involving third parties) (collectively, "Claims") will, at the election of either party, be resolved by arbitration, including any dispute about arbitrability, such as scope and enforceability.

(b) Arbitration Process. Any arbitration will be conducted pursuant to the applicable rules (the "Arbitration Rules") of the American Arbitration Association, as modified herein, to the extent such modifications are not prohibited by the Arbitration Rules. The arbitration will be conducted in Chicago, Illinois. The parties will select a single arbitrator, but in the event that the parties are unable to agree, the arbitrator will be appointed pursuant to the Arbitration Rules. The arbitrator will be a practicing attorney with significant expertise in litigating and/or presiding over cases involving the substantive legal areas involved in the dispute. The parties to the arbitration will not request, and the arbitrator will not order, that any discovery be taken or provided, including depositions, interrogatories or document requests, except to the extent the amount in controversy exceeds $50,000. The arbitration will be concluded within three months of the date the arbitrator is appointed. The arbitrator's findings, reasoning, decision, and award will be stated in writing and based upon applicable law. Judgment on the arbitration award may be entered in any court having jurisdiction. In the event that the arbitration results in an award which imposes an injunction or contains a monetary award in excess of $100,000, the award will be reviewable on appeal initiated by filing notice of appeal with the AAA office within 30 days of the award, governed by the AAA Optional Appellate Arbitration Rules and conducted by a panel of three new arbitrators, ruling by majority, under the procedure for appointment from the national roster of arbitrators. Unless the applicable Arbitration Rules require otherwise, arbitration fees and costs will be shared equally by the claimant(s) and respondent(s), respectively, in any arbitration proceeding. Should the AAA be unavailable, unable or unwilling to accept and administer the arbitration of any claim under these arbitration provisions as written, the parties will agree on a substitute arbitration organization, such as JAMS, that will enforce the arbitration provisions as written. *Because this Agreement memorializes a transaction in interstate commerce, the Federal Arbitration Act governs the interpretation and enforcement of these arbitration provisions. More information about arbitration, including the Arbitration Rules, is available at www.adr.org or by calling 1-800-778-7879.*

(c) Claims Excluded from Arbitration. The following matters will not be subject to arbitration but will instead be adjudicated in the courts of Cook County, Illinois or such other court in which jurisdiction and venue are proper: (a) an action for possession or for injunctive remedies provided under applicable landlord-tenant laws or to enforce intellectual property rights; (b) a suit by Owner or its assignee for collection of amounts owed by Resident under this Agreement; and (c) any claim or dispute for which applicable law (as determined by a binding court decision) or the applicable arbitration rules do not permit arbitration and require adjudication in a specific civil court. Matters within the jurisdiction of an applicable small claims court may also be brought in that court in lieu of arbitration.

(d) Right to Opt Out of Arbitration. RESIDENT MAY OPT OUT OF THE FOREGOING ARBITRATION PROVISIONS BY SENDING EXPRESS WRITTEN NOTICE (VIA CERTIFIED US MAIL OR RECOGNIZED COURIER SERVICE) ELECTING TO OPT OUT OF ARBITRATION PROVISIONS, WITHIN 30 DAYS OF RESIDENT'S EXECUTION OF THIS AGREEMENT, to: The Scion Group, Attn: Legal Department, 444 N. Michigan Ave., Suite 2600, Chicago IL 60611. Resident will continue to be bound by any other arbitration provision Resident did not out opt of.

(e) Applicable Law; Attorney Fees. All claims and disputes, including those adjudicated in arbitration or in court, will be governed by the internal laws of the State of Illinois with respect to contracts made or events occurring therein. Unless prohibited by applicable law, the substantially prevailing party in any dispute between the parties (including in arbitration) may recover their reasonable costs and fees incurred in connection with such matter, including reasonable attorneys' fees.

(f) Class Action Waiver. **THE PARTIES AGREE THAT ANY CLAIMS WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS, AND EACH WAIVES THE RIGHT TO PARTICIPATE IN A CLASS, COLLECTIVE, PAGA, OR OTHER JOINT ACTION WITH RESPECT TO THE CLAIMS.**

[8] Sloane C Buxton [23] Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

(g) Waiver of Jury Trial. **THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A JURY TRIAL FOR CLAIMS NOT SUBJECT TO ARBITRATION, WHICH WILL BE ADJUDICATED BY A JUDGE ONLY.**

(h) Severability and Survival. To the extent any provision of this paragraph 30 is found to be unenforceable, it will be severed so the parties' intent to arbitrate will survive and arbitration will proceed without such provision; provided that if the class-action waiver is found unenforceable for any reason, the arbitration provisions of this paragraph 30 will be void. All of the terms and provisions of this paragraph 30 will survive the termination or expiration of this Agreement.

**31. Miscellaneous.** Failure of Owner to insist upon strict compliance with the terms of this Agreement will not constitute a waiver of Owner's rights to act on any violation. Owner's rights are cumulative and the exercise of any remedy by Owner will not exclude or waive the right to exercise any other right or remedy. Time is of the essence in the performance of this Agreement. Owner and its agents and affiliates make no representations or warranty as to the character or standing of any other residents of the Property. This Agreement and any attached and signed addenda constitute the entire agreement between the parties and no oral statements will be binding. Any amendment to this Agreement, other than a change to the Community Policies, must be in writing and signed by Resident and Owner or its authorized agent. If any provision of this Agreement requires the permission or consent of Owner, such written permission or consent may be granted or withheld in the sole discretion of Owner or its designated agent or representative, or may contain such conditions as Owner deems appropriate and will be effective only if Resident complies with such conditions; any such permission or consent given by Owner to Resident may be modified, revoked or withdrawn by Owner at any time, upon reasonable written notice to Resident, as Owner reasonably determines is necessary for the protection of safety, property or welfare of residents or personnel of the Property. If any provision of this Agreement is found to be unenforceable or inapplicable, then the remaining provisions will not be voided and will remain in full force and effect. **Resident acknowledges receipt of summaries of the Chicago Residential Landlord and Tenant Ordinance, included on pages 10-14.** The "Rate of Interest on Security Deposits" summary is provided only to the extent required by law, although there is no security deposit under this Agreement.

***SIGNATURES ARE ON PAGE 1***

*Ion Lincoln Park is an Equal Opportunity housing provider.*

[9] Sloane C Buxton [24] Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# *Chicago* Rents Right

Good Tenants, Good Landlords, Great Neighborhoods!

For more information, please call 312-742-RENT(7368)

10 Sloane C Buxton 25 Joshua Sulloway

10



FILED DATE: 9/13/2022 9:22 AM 2022CH09018

Lori E. Lightfoot
Mayor of Chicago

# CITY OF CHICAGO RESIDENTIAL LANDLORD AND TENANT ORDINANCE SUMMARY

DOH
Department of Housing

**At initial offering, this Summary of the ordinance must be attached to every written rental agreement and also upon initial offering for renewal. The Summary must also be given to a tenant at initial offering of an oral agreement, whether the agreement is new or a renewal. Unless otherwise noted, all provisions are effective as of November 6, 1986. {Mun. Code Ch. 5-12-170}**

**IMPORTANT: IF YOU SEEK TO EXERCISE RIGHTS UNDER THE ORDINANCE, OBTAIN A COPY OF THE ENTIRE ORDINANCE TO DETERMINE APPROPRIATE REMEDIES AND PROCEDURES. CONSULTING AN ATTORNEY WOULD ALSO BE ADVISABLE. FOR A COPY OF THE ORDINANCE, VISIT THE CITY CLERK'S OFFICE ROOM 107, CITY HALL, 121 N. LASALLE, CHICAGO, ILLINOIS.**

## IMPORTANT NOTICE

**A message about porch safety:** The porch or deck of this building should be designed for a live load of up to 100 lbs. per square foot, and is safe only for its intended use. Protect your safety. Do not overload the porch or deck. If you have questions about porch or deck safety, call the City of Chicago non-emergency number, 3-1-1.

## WHAT RENTAL UNITS ARE COVERED BY THE ORDINANCE? {MUN. CODE CH. 5-12-010 & 5-12-020}

- Rental units with written or oral leases (including all subsidized units such as CHA, IHDA, Section 8 Housing Choice Vouchers, etc.)

**EXCEPT**

- Units in owner occupied buildings with six or fewer units.
- Units in hotels, motels, rooming houses, unless rent is paid on a monthly basis and unit is occupied for more than 32 days.
- School dormitory rooms, shelters, employee's quarters, non-residential rental properties.
- Owner occupied co-ops and condominiums.

## WHAT ARE THE TENANT'S GENERAL DUTIES UNDER THE ORDINANCE? {MUN. CODE CH. 5-12-040}

The tenant, the tenant's family and invited guests must comply with all obligations imposed specifically upon tenants by provision of the Municipal Code, applicable to dwelling units, including section 7-28-859:

- Buying and installing working batteries in smoke and carbon monoxide detectors within tenant's apartment.
- Keeping the unit safe and clean.
- Using all equipment and facilities in a reasonable manner.
- Not deliberately or negligently damaging the unit.
- Not disturbing other residents.

## LANDLORD'S RIGHT OF ACCESS {MUN. CODE CH. 5-12-050}

- A tenant shall permit reasonable access to a landlord upon receiving two days notice by mail, telephone, written notice or other means designed in good faith to provide notice.
- A general notice to all affected tenants may be given in the event repair work on common areas or other units may require such access.
- In the event of emergency or where repairs elsewhere unexpectedly require access, the landlord must provide notice within two days after entry.

## SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081}

- A landlord must give a tenant a receipt for a security deposit including the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
- However, if the security deposit is paid by means of an electronic funds transfer, the landlord has the option to give an electronic receipt. The electronic receipt must describe the dwelling unit, state the amount and date of the deposit, and have an electronic or digital signature. (eff. 10-8-10)
- However, the landlord may accept the payment of the first month's rent and the security deposit in one check or one electronic funds transfer and deposit such rent and security deposit into one account, if the landlord within 5 days of such acceptance transfers the security deposit into a separate account. (eff. 10-8-10)
- A landlord must hold all security deposits in a federally insured interest-bearing account in a financial institution located in Illinois. Security deposits and interest thereon shall not be commingled with the assets of the landlord.
- A written rental agreement must specify the financial institution where the security deposit will be deposited. If there is no written rental agreement, the landlord must in writing provide such information to the tenant within 14 days of the receipt of the security deposit. If the security deposit is transferred to another financial institution, the landlord must notify the tenant within 14 days of the transfer the name and address of the new financial institution. (eff. 10-8-10)

11 Sloane C Buxton 26 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

**SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081} (cont.)**

- A landlord must pay interest each year on security deposits and prepaid rent held more than six months. (eff. 1-1-92)
- The rate of interest a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before expenses for damages can be deducted from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- A landlord must return all security deposits and required interest, if any, minus unpaid rent and expenses for damages, within 45 days from the date the tenant vacates the unit.
- In the event of a fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)
- In the event of a sale or any other disposition of residential real property by a landlord, the successor landlord is liable to the tenant for any security deposit or prepaid rent paid to the original landlord. The successor landlord must notify the tenant, in writing, within 14 days from the disposition that the deposit or prepaid rent was transferred to the successor landlord. The original landlord remains liable for the deposit or prepaid rent until the original landlord transfers the deposit or prepaid rent to the successor landlord and provides proper notice of such transfer to the tenant. (Mun. Code Ch. 5-12-080 (e) eff. 5-18-10)
- Subject to correcting a deficient amount of interest paid to a tenant on a security deposit if a landlord fails to comply with specified security deposit requirements the tenant shall be awarded damages in an amount equal to two times the security deposit plus interest. (eff. 10-8-10)

**WHAT ARE THE LANDLORD'S GENERAL DUTIES UNDER THE ORDINANCE?**

- To give tenant written notice of the owner's or manager's name, address and telephone number. {Mun. Code Ch. 5-12-090}
- Within seven (7) days of being served a foreclosure complaint an owner or landlord of a premises that is the subject of the foreclosure complaint shall disclose, in writing, to all tenants of the premises that a foreclosure action has been filed. The owner or landlord shall also notify of a foreclosure suit, in writing, before a tenant signs a lease.
  {Mun. Code Ch. 5-12-095 eff.11-05-08}
- To give new or renewing tenants notice of:
  1) Code citations issued by the City in the previous 12 months;
  2) Pending Housing Court or administrative hearing actions;
  3) Water, electrical or gas service shut-offs to the building during entire occupancy. {Mun. Code Ch. 5-12-100}
- To maintain the property in compliance with all applicable provisions of the Municipal Code. {Mun. Code Ch. 5-12-070}
- To not require a tenant to renew an agreement more than 90 days before the existing agreement terminates. (eff. 1-1-92)
  {Mun. Code Ch. 5-12-130 (i)}
- If the rental agreement will not be renewed, or if the rental rate will be increased, to provide a tenant with at least 30 days if the tenant has occupied the apartment for up to six months; 60 days if the tenant has occupied the apartment for more than six months and up to three years; and 120 days if the tenant has occupied the apartment for more than three years. (eff. 7-28-20) {Mun. Code Ch. 5-12-130 (j)}
- To not enforce prohibited lease provisions. {Mun. Code Ch. 5-12-140}
- Bed Bugs-Education. For any rental agreement for a dwelling unit entered into or renewed after the effective date of this 2013 amendatory ordinance, prior to entering into or renewing such agreement, the landlord or any person authorized to enter into such agreement on his behalf shall provide to such tenant the informational brochure on bed bug prevention and treatment prepared by the department of health pursuant to section 7-28-860. {Mun. Code Ch. 5-12-101}

**TENANT REMEDIES {MUN. CODE CH. 5-12-110}**

Minor Defects

- If the landlord fails to maintain the property in compliance with the Code and the tenant or the tenant's family or guests are not responsible for the failure, the tenant may:
  1) Request in writing that the landlord make repairs within 14 days, and if the landlord fails to do so the tenant may withhold an amount of rent that reasonably reflects the reduced value of the unit. Rent withholding begins from the fifteenth day until repairs are made; OR
  2) Request in writing that the landlord make repairs within 14 days and if the landlord fails to do so the tenant may have the repairs made and deduct up to $500 or 1/2 of the month's rent, whichever is more, but not to exceed one month's rent. Repairs must be done in compliance with the Code. Receipt for the repairs must be given to the landlord and no more than the cost of the repairs can be deducted from the rent; and also
  3) File suit against the landlord for damages and injunctive relief.

Major Defects

- If the landlord fails to maintain the property in compliance with the Code, and the failure renders the premises not reasonably fit and habitable, the tenant may request in writing that the landlord make repairs within 14 days. If after 14 days repairs are not made, the tenant may immediately terminate the lease. Tenant must deliver possession and move out in 30 days or tenant's notice is considered withdrawn.
  (eff. 1-1-92)

**FAILURE TO PROVIDE ESSENTIAL SERVICES (HEAT, RUNNING OR HOT WATER, ELECTRICITY, GAS OR PLUMBING) {MUN. CODE CH. 5-12-110(f)}**

- If, contrary to the lease, an essential service is not provided, or if the landlord fails to maintain the building in material compliance with the Code to such an extent that such failure constitutes an immediate danger to the health and safety of the tenant, and the tenant or tenant's family or guests are not responsible for such failure, after giving written notice, the tenant may do ONE of the following:
  1) Procure substitute service, and upon presenting paid receipts to the landlord, deduct the cost from the rent; OR
  2) File suit against the landlord and recover damages based on the reduced value of the dwelling unit; OR
  3) Procure substitute housing and be excused from paying rent for that period. The tenant may also recover from the landlord the cost of substitute housing up to an amount equal to the monthly rent for each month or portion thereof; OR
  4) Request that the landlord correct the failure within 24 hours and if the landlord fails to do so, withhold the monthly rent an amount that reason-

12 Sloane C Buxton 27 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

ably reflects the reduced value of its premises. Rent withholding cannot start until after the 24 hours expires and applies only to days past the 24-hour waiting period; OR (eff. 1-1-92)

5) Request that the landlord correct the failure within 72 hours and if the landlord fails to do so, terminate the rental agreement. If the rental agreement is terminated, the tenant must deliver possession and move out within 30 days or the notice of termination is considered withdrawn. (eff. 1-1-92)

**Note: Remedies 4) and 5) may not be used if the failure is due to the utility provider's failure to provide service**. For the purposes of this section only, the notice a tenant provides must be in writing, delivered to the address the landlord has given the tenant as an address to which notices should be sent. If the landlord does not inform the tenant of an address, the tenant may deliver written notice to the last known address of the landlord or by any other reasonable means designed in good faith to provide written notice to the landlord. (eff.1-1-92)

**FIRE OR CASUALTY DAMAGE {MUN. CODE CH. 5-12-110 (g)}**

• If a fire damages the unit to an extent that it is in material noncompliance with the Code and the tenant, tenant's family or guests are not responsible for the fire or accident, the tenant may:

1) Move out immediately, but if this is done, the tenant must provide written notice to the landlord of the intention to terminate within 14 days after moving out.
2) The tenant may stay in the unit, if it is legal, but if the tenant stays and cannot use a portion of the unit because of damage, the rent may be reduced to reflect the reduced value of the unit.
3) If the tenant stays, and the landlord fails to diligently carry out the work, the tenant may notify the landlord, in writing, within 14 days after the tenant becomes aware that the work is not being diligently carried out, of the tenant's intention to terminate the rental agreement and move out.

**SUBLEASES {MUN. CODE CH. 5-12-120}**

- The landlord must accept a reasonable subtenant offered by the tenant without charging additional fees.
- If a tenant moves prior to the end of the rental agreement, the landlord must make a good faith effort to find a new tenant at a fair rent.
- If the landlord is unsuccessful in re-renting the unit, the tenant remains liable for the rent under the rental agreement, as well as the landlord's cost of advertising.

**WHAT HAPPENS IF A TENANT PAYS RENT LATE? {MUN. CODE CH. 5-12-140 (h)}**

- If the tenant fails to pay rent on time, the landlord may charge a late fee of $10.00 per month on rents under $500 plus 5 percent per month on that part of the rent that exceeds $500.00 (i.e., for a $450.00 monthly rent the late fee is $10.00, for a $700 monthly rent the late fee is $10 plus 5% of $200.00 or $20.00 total) (eff. 1-1-92)

**WHAT HAPPENS IF A TENANT PAYS RENT DUE AFTER THE EXPIRATION OF THE TIME PERIOD SET FORTH IN A TERMINATION NOTICE? {MUN. CODE CH. 5-12-140 (g) CH. 5-12-130 (g)}**

- If the landlord accepts the rent due knowing that there is a default in payment, the tenant may stay.

**LANDLORD REMEDIES {MUN. CODE CH. 5-12-130}**

- If the tenant fails to pay rent, the landlord, after giving five days written notice to the tenant, may terminate the rental agreement. However, the tenant may remain in the unit with a rental agreement in good standing if the tenant pays the full amount of back rent and landlord court filing fees before a judge issues an order of possession. If, however, the tenant uses this provision and later receives a second written notice of nonpayment, the tenant will have only five days to pay unpaid rent.
- If the tenant fails to comply with the Code or the rental agreement, the landlord, after giving 10 days written notice to the tenant, may terminate the rental agreement if tenant fails to correct the violation.
- If the tenant fails to comply with the Code or the rental agreement, the landlord may request in writing that the tenant comply as promptly as conditions permit in the case of emergency, or within 14 days. If the breach is not corrected in the time period specified, the landlord may enter the dwelling unit and have the necessary work done. In this case, the tenant shall be responsible for all costs of repairs.

**LOCKOUTS {MUN. CODE CH. 5-12-160}**

This section applies to every residential rental unit in Chicago. There are no exceptions.

- It is illegal for a landlord to lock out a tenant, or change locks, or remove doors of a rental unit, or cut off heat, utility or water service, or to do anything which interferes with the tenant's use of the apartment.
- All lockouts are illegal and the Police Department is responsible for enforcement against such illegal activity. (eff. 1-1-92) (Police Special Order 93-12)
- The landlord shall be fined $200 to $500 for each day the lockout occurs or continues.
- The tenant may sue the landlord to recover possession of the unit and twice the actual damages sustained or two months' rent, whichever is greater.

**PROHIBITION ON RETALIATORY CONDUCT BY LANDLORD {MUN. CODE CH. 5-12-150}**

- A tenant has the right to complain or testify in good faith about their tenancy to governmental agencies or officials, police, media, community groups, tenant unions or the landlord. A landlord is prohibited from retaliating by terminating or threatening to terminate a tenancy, increasing rent, decreasing services, bringing or threatening to bring an eviction action, or refusing to renew a lease agreement.

**ATTORNEY'S FEES {MUN. CODE CH. 5-12-180}**

- Except in eviction actions, the prevailing plaintiff in any action arising from the application of this Ordinance shall be entitled to recover all court costs and reasonable attorney's fees. (eff. 1-1-92)

**WHERE CAN I GET A COPY OF THE ORDINANCE?**

- For a copy of the Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 North LaSalle Street, Chicago, Illinois or view it at the Municipal Reference Library, Harold Washington Library, 5th Floor, 400 S. State Street, Chicago, Illinois.

*Approved by the City of Chicago, June 2013; Summary Revised 2020*

11250-12

13 Sloane C Buxton

28 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# Residential Landlord and Tenant Ordinance

*Rate of Interest on Security Deposits*

*Municipal code chapters 5-12-080, 5-12-081 and 5-12-170*

- A landlord must give a tenant a receipt for a security deposit that includes the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
- A landlord must pay interest each year on security deposits (eff. 11-6-86) and prepaid rent (eff. 1-1-92) held more than six months.
- The rate of interest that a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before a landlord can deduct expenses for damages from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- Within 45 days of the date the tenant vacates the dwelling unit, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages.
- In the event of fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)

Under Chapter 5-12 of the Municipal Code of Chicago sections 5-12-081 and 5-12-082, the City Comptroller shall calculate and announce on the first business day of each year, the rate of interest to be paid on security deposits. As of Jan. 1, 2020, based on information from the City Comptroller's Office, the interest rate to be paid on security deposits is 0.01%.

The rate is based upon the average of the rates of interest of the following types of accounts at Chase Bank, which is the commercial bank having the most branches located in the City of Chicago: Savings Account 0.01 percent, insured Money Market 0.01 percent and Six-month Certificate of Deposit (based on a deposit of $1,000) 0.01 percent.

**Security Deposit Interest Rate**
Jan. 1-Dec. 31, 2020: 0.01%

| | | |
|---|---|---|
| 2015 to 2019: 0.01% | 2008: 1.26% | 2001: 3.10% |
| 2014: 0.013% | 2007: 1.68% | 2000: 2.71% |
| 2013: 0.023% | 2006: 1.71% | 1999: 2.63% |
| 2012: 0.057% | 2005: 1.01% | 1997: 3.38% |
| 2011: 0.073% | 2004: 0.42% | Pre-July 1997: 5% |
| 2010: 0.073% | 2003: 0.52% | |
| 2009: 0.12% | 2002: 0.83% | |

For a copy of the complete Residential Landlord and Tenant Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 N. LaSalle St. For a copy of the Residential Landlord and Tenant Ordinance Summary, visit the Department of Housing, City Hall, Room 1006.

Department of Housing | 121 N. LaSalle St. | Room 1006 | Chicago, Illinois 60602
@ChicagoDOH

29 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# Ordenanza de Residencias para Duenos e Inquilinos (Arrendatrios)

***Tarifa de Interes en Depositos de Seguridad***

*Codigo Municipal, Capitulo 5-12-080, 5-12-081 y 5-12-170*

- El dueño del edificio (propietario) debe darle a su inquilino (arrendatario) un recibo por Depósito de Seguridad que incluya el nombre de la persona, la fecha cuando fue recibido y la descripción de la unidad (casa) que esta rentando. El recibo debe ser firmado por la persona aceptando el depósito de seguridad.
- El dueño del edificio debe pagar interes cada año en el depósito de seguridad (eff. 11-6-86) y renta en Ia prepagada (eff. 1-1-92) retenida por más de seis meses.
- La tarifa de interés que el dueño del edificio debe pagar es fijada cada año por el Controlador de la Ciudad. (eff. 7-1-97).
- Antes que el dueño del edificio pueda deducir los gastos por daños del deposito de seguridad, el dueño del edificio deberá proporcionar a su inquilino (arrendatario) una declaración detallada de los articulos dañados, dentro de los 30 dias de Ia fecha que el inquilino (arrendatario) deje vacante la unidad que rentaba.
- Dentro de los 45 dias de la fecha que el inquilino (arrendatario) deje vacante la unidad o casa, el dueño del edificio deberá devolver todos los depósitos de seguridad y el interés requerido, si lo hay, menos Ia renta sin pagar y los gastos por los daños.
- En el evento de fuego, el dueño del edificio deberá devolver todos los depósitos de seguridad y el interés requerido, si lo hay, menos la renta sin pagar y los gastos por daños, dentro de los siete dias en que el inquilino (arrendatario) proporcionó notificación de terminación del acuerdo de renta. (eff. 1-1-92)

Bajo el Capitulo 5-1 2 del Codigo Municipal de Chicago, secciones 5-12-081 y 5-12-082, el controlador de la Ciudad debera calcular y anunciar con el primer día de negocios de cada año, la tarifa de interés con la que los depósitos de seguridad serán pagados. Empezando Enero 1, del 2020 basado en la información de la Oficina del Controlador (City Comptroller's Office), la tarifa de interés en depósitos de seguridad es de 0.01 por ciento. Esta tarifa esta basada en un promedio del interés de las cuentas de ahorros regulares de los siguientes tipos de cuentas de Chase Bank, **el cual es el banco comercial que tiene mas sucursales localizadas en la Ciudad de Chicago**: Libras de Ahorros 0.01 por ciento; Dinero Asegurado por la Bolsa 0.01 por ciento; y Certificado de Deposito por seis meses (basado en depósitos de $1,000) 0.01 por ciento.

**Tarifa de Interes Deposito de Seguridad**

Enero 1-Diciembre 31, 2020: 0.01%

| | | |
|---|---|---|
| 2015 - 2019: 0.01% | 2008: 1.26% | 2001: 3.10% |
| 2014: 0.013% | 2007: 1.68% | 2000: 2.71% |
| 2013: 0.023% | 2006: 1.71% | 1999: 2.63% |
| 2012: 0.057% | 2005: 1.01% | 1997: 3.38 % |
| 2011: 0.073% | 2004: 0.42% | Antes de Julio 1997: |
| 2010: 0.073% | 2003: 0.52% | 5% |
| 2009: 0.12% | 2002: 0.83% | |

Para una copia de la Ordenanza de Residencias para Dueños e Inquilinos, visite la oficina del City Clerk, Cuarto 107, 121 N. LaSalle St. Para una copia del resumen de la Ordenanza de Residencias para Dueños e Inquilinos, visite DOH, 121 N. LaSalle St., Cuarto 1006.

Department of Housing | 121 N. LaSalle St. | Room 1006 | Chicago, Illinois 60602
@Chic~ goDOH

15 Sloane C Buxton 30 Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

## CONCESSION ADDENDUM

This Concession Addendum is entered into on Apr 01, 2022 between Sloane C Buxton **(Resident")** and **1237 Fullerton LLC d/b/a "Ion Lincoln Park"** ("**Owner**") and is binding only when signed by Owner or its agent.

Resident's Housing Agreement covering the term of September 01, 2022 to August 10, 2023, is amended to provide a total sale price concession of $960.00. This concession will be applied equally as a credit of $80.00 against each installment. Resident will pay the installment payments specified in the Housing Agreement less the per-installment credit amount.

All other provisions of the Housing Agreement remain in effect and unchanged. As consideration for this Concession Addendum, Resident agrees that if the Housing Agreement is terminated for any reason prior to the End Date or all net amounts due under the Housing Agreement are not paid as and when due, the entire concession will become void and must be repaid.

**ACCEPTANCE BY OWNER:**

**1237 Fullerton LLC**
**d/b/a "Ion Lincoln Park"**

SEE BELOW FOR ELECTRONIC SIGNATURE
Signature of Resident

**By:** SEE BELOW FOR ELECTRONIC SIGNATURE
**Authorized Agent**

[1] Sloane C Buxton [2] Joshua Sulloway

# Ion Lincoln Park Housing Agreement

## Signature Details

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

| | Signer | IP Address | Date Signed |
|---|---|---|---|
| | **2022-23 Housing Agreement - Ion Lincoln Park** | | |
| **1** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **2** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **3** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **4** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **5** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **6** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **7** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **8** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **9** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **10** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **11** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **12** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **13** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **14** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **15** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **16** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **17** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **18** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |

FILED DATE: 9/13/2022 9:22 AM    2022CH09018

| | | | |
|---|---|---|---|
| **19** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **20** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **21** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **22** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **23** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **24** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **25** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **26** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **27** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **28** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **29** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **30** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| | **Concession Addendum** | | |
| **1** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:40 PM |
| **2** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:27 PM |

FILED
9/13/2022 9:22 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09018
Calendar, 7
19461383

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# LIVE AHEAD

## COMMUNITY FEATURES

- 24-hour fitness center
- Collaboration spaces on each floor
- Resident lounges
- Business center
- Attached heated parking garage
- Bike storage room
- Social and networking events for residents and friends
- 24-hour door staff

## RESIDENCE FEATURES

- 2 to 4-bedroom spacious apartments
- Single bedrooms, available private bathrooms
- Fully furnished
- 9-foot ceilings, floor-to-ceiling windows
- Granite countertops
- Electricity, water and Internet included
- Free on-site laundry
- Electronic locks and locking bedrooms
- Available per-person contracts, roommate matching

# RATES:

| | |
|---|---|
| 4 Bedroom, 2 Bath | $1,029 |
| 3 Bedroom, 2 Bath | $1,339 |
| 2 Bedroom, 2 Bath | $1,499 |

# ADD-ONS:

| | |
|---|---|
| Upper floor placement | $25 |
| City view + upper floor placement | $50 |
| In-building garage parking | $175 |
| Master bedroom with in-suite bath | $300 |
| Short-term premium 6 Installments | $300 |
| Short-term premium 10 Installments | $150 |
| Required utility/amenity fee | $99 |

* All rates are per person, 12 installments for a standard term of September 01, 2022 to August 10, 2023. Additional $99 utility/amenity fee required with each installment, which includes Internet, heat/AC, electricity, water/sewer, furnishings, on-site laundry and community amenities. Annual $300 administrative fee required. Limited spaces are available for immediate move-in; please inquire with our staff.

ION-LINCOLNPARK.COM

1237 W FULLERTON AVE | CHICAGO, ILLINOIS | (773) 395-4500

A SCION COMMUNITY

FILED
9/13/2022 9:22 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09018
Calendar, 7
19461383

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

# EXHIBIT A

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

affiliates a royalty-free license to use Resident's image and likeness for all lawful purposes, including promotional purposes in advertising, video, web, social media and other formats.

29. **Multiple Bedroom Spaces.** If this Housing Agreement expressly identifies more than one bedroom space in a multi-bedroom apartment as assigned to Resident on page 1, then: (a) references to a "space" or "spaces" will be deemed to refer to all of the spaces assigned to Resident, or to the entire apartment if all of the bedrooms in an apartment are assigned to Resident; and (b) if Resident is assigned fewer than all of the bedroom spaces in an apartment, use of common areas will continue to be shared with other residents of the apartment and any calculation of Resident's share of any charges assessed pro rata to all residents of an apartment will be made by dividing the number of bedroom spaces assigned to Resident by the total number of occupied bedroom spaces within the apartment.

30. **DISPUTE RESOLUTION; MANDATORY ARBITRATION; CLASS-ACTION WAIVER.**

(a) Claims Subject to Arbitration. Except as expressly provided below, the parties agree that to the fullest extent permitted by applicable law, any dispute arising out of or relating in any way to this Agreement or a similar prior agreement, the Property or the relationship between Resident and Owner or Manager (including matters occurring prior to the date of this Agreement and disputes also involving third parties) (collectively, "Claims") will, at the election of either party, be resolved by arbitration, including any dispute about arbitrability, such as scope and enforceability.

(b) Arbitration Process. Any arbitration will be conducted pursuant to the applicable rules (the "Arbitration Rules") of the American Arbitration Association, as modified herein, to the extent such modifications are not prohibited by the Arbitration Rules. The arbitration will be conducted in Chicago, Illinois. The parties will select a single arbitrator, but in the event that the parties are unable to agree, the arbitrator will be appointed pursuant to the Arbitration Rules. The arbitrator will be a practicing attorney with significant expertise in litigating and/or presiding over cases involving the substantive legal areas involved in the dispute. The parties to the arbitration will not request, and the arbitrator will not order, that any discovery be taken or provided, including depositions, interrogatories or document requests, except to the extent the amount in controversy exceeds $50,000. The arbitration will be concluded within three months of the date the arbitrator is appointed. The arbitrator's findings, reasoning, decision, and award will be stated in writing and based upon applicable law. Judgment on the arbitration award may be entered in any court having jurisdiction. In the event that the arbitration results in an award which imposes an injunction or contains a monetary award in excess of $100,000, the award will be reviewable on appeal initiated by filing notice of appeal with the AAA office within 30 days of the award, governed by the AAA Optional Appellate Arbitration Rules and conducted by a panel of three new arbitrators, ruling by majority, under the procedure for appointment from the national roster of arbitrators. Unless the applicable Arbitration Rules require otherwise, arbitration fees and costs will be shared equally by the claimant(s) and respondent(s), respectively, in any arbitration proceeding. Should the AAA be unavailable, unable or unwilling to accept and administer the arbitration of any claim under these arbitration provisions as written, the parties will agree on a substitute arbitration organization, such as JAMS, that will enforce the arbitration provisions as written. *Because this Agreement memorializes a transaction in interstate commerce, the Federal Arbitration Act governs the interpretation and enforcement of these arbitration provisions. More information about arbitration, including the Arbitration Rules, is available at www.adr.org or by calling 1-800-778-7879.*

(c) Claims Excluded from Arbitration. The following matters will not be subject to arbitration but will instead be adjudicated in the courts of Cook County, Illinois or such other court in which jurisdiction and venue are proper: (a) an action for possession or for injunctive remedies provided under applicable landlord-tenant laws or to enforce intellectual property rights; (b) a suit by Owner or its assignee for collection of amounts owed by Resident under this Agreement; and (c) any claim or dispute for which applicable law (as determined by a binding court decision) or the applicable arbitration rules do not permit arbitration and require adjudication in a specific civil court. Matters within the jurisdiction of an applicable small claims court may also be brought in that court in lieu of arbitration.

(d) Right to Opt Out of Arbitration. RESIDENT MAY OPT OUT OF THE FOREGOING ARBITRATION PROVISIONS BY SENDING EXPRESS WRITTEN NOTICE (VIA CERTIFIED US MAIL OR RECOGNIZED COURIER SERVICE) ELECTING TO OPT OUT OF ARBITRATION PROVISIONS, WITHIN 30 DAYS OF RESIDENT'S EXECUTION OF THIS AGREEMENT, to: The Scion Group, Attn: Legal Department, 444 N. Michigan Ave., Suite 2600, Chicago IL 60611. Resident will continue to be bound by any other arbitration provision Resident did not out opt of.

(e) Applicable Law; Attorney Fees. All claims and disputes, including those adjudicated in arbitration or in court, will be governed by the internal laws of the State of Illinois with respect to contracts made or events occurring therein. Unless prohibited by applicable law, the substantially prevailing party in any dispute between the parties (including in arbitration) may recover their reasonable costs and fees incurred in connection with such matter, including reasonable attorneys' fees.

(f) Class Action Waiver. **THE PARTIES AGREE THAT ANY CLAIMS WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS, AND EACH WAIVES THE RIGHT TO PARTICIPATE IN A CLASS, COLLECTIVE, PAGA, OR OTHER JOINT ACTION WITH RESPECT TO THE CLAIMS.**

S Sloane C Buxton   JS Joshua Sulloway

FILED DATE: 9/13/2022 9:22 AM 2022CH09018

(g) Waiver of Jury Trial. **THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A JURY TRIAL FOR CLAIMS NOT SUBJECT TO ARBITRATION, WHICH WILL BE ADJUDICATED BY A JUDGE ONLY.**

(h) Severability and Survival. To the extent any provision of this paragraph 30 is found to be unenforceable, it will be severed so the parties' intent to arbitrate will survive and arbitration will proceed without such provision; provided that if the class-action waiver is found unenforceable for any reason, the arbitration provisions of this paragraph 30 will be void. All of the terms and provisions of this paragraph 30 will survive the termination or expiration of this Agreement.

**31. Miscellaneous.** Failure of Owner to insist upon strict compliance with the terms of this Agreement will not constitute a waiver of Owner's rights to act on any violation. Owner's rights are cumulative and the exercise of any remedy by Owner will not exclude or waive the right to exercise any other right or remedy. Time is of the essence in the performance of this Agreement. Owner and its agents and affiliates make no representations or warranty as to the character or standing of any other residents of the Property. This Agreement and any attached and signed addenda constitute the entire agreement between the parties and no oral statements will be binding. Any amendment to this Agreement, other than a change to the Community Policies, must be in writing and signed by Resident and Owner or its authorized agent. If any provision of this Agreement requires the permission or consent of Owner, such written permission or consent may be granted or withheld in the sole discretion of Owner or its designated agent or representative, or may contain such conditions as Owner deems appropriate and will be effective only if Resident complies with such conditions; any such permission or consent given by Owner to Resident may be modified, revoked or withdrawn by Owner at any time, upon reasonable written notice to Resident, as Owner reasonably determines is necessary for the protection of safety, property or welfare of residents or personnel of the Property. If any provision of this Agreement is found to be unenforceable or inapplicable, then the remaining provisions will not be voided and will remain in full force and effect. **Resident acknowledges receipt of summaries of the Chicago Residential Landlord and Tenant Ordinance, included on pages 10-14.** The "Rate of Interest on Security Deposits" summary is provided only to the extent required by law, although there is no security deposit under this Agreement.

***SIGNATURES ARE ON PAGE 1***

*Ion Lincoln Park is an Equal Opportunity housing provider.*

Sloane C Buxton Joshua Sulloway

FILED
7/13/2022 3:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH04059
Calendar, 10
18659994

FILED
9/13/2022 9:22 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09018
Calendar, 7
19461383

FILED DATE: 7/13/2022 3:29 PM 2022CH04059
FILED DATE: 9/13/2022 9:22 AM 2022CH09018

**STATE OF ILLINOIS**
**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SLOANE BUXTON, Individually and on behalf of others similarly situated

Plaintiff,

v.

THE SCION GROUP, LLC, and 1237 FULLERTON, LLC,

Defendants.

Case No.: 2022-CH-04059

Calendar 10

Hon. Kate Moreland

**DEFENDANTS' MOTION TO COMPEL INDIVIDUAL ARBITRATION, DISMISS PLAINTIFF'S CLASS CLAIMS, AND STAY ALL PROCEEDINGS**

Defendants, THE SCION GROUP, LLC ("Scion") and 1237 FULLERTON, LLC ("Fullerton") (collectively, "Defendants"), by the undersigned counsel, hereby move to compel individual arbitration, dismiss the class claims filed by Plaintiff, SLOANE BUXTON ("Plaintiff"), and stay all proceedings pursuant to the Federal Arbitration Act and 735 ILCS 5/2-619. In support thereof, Defendants state as follows:

## I. INTRODUCTION

Plaintiff filed a class action complaint against Defendants in which she alleges Defendants violated the City of Chicago Residential Landlord and Tenant Ordinance. The claim arise out of a written rental agreement for a dwelling unit in Chicago, which is owned by Fullerton and operated by Scion. Under the rental agreement, Plaintiff agreed to a broad arbitration provision – widely recognized by both the relevant state and federal law state – whereby any claim Plaintiff might have arising from or relating in any way to the rental agreement would be resolved through mandatory arbitration. Plaintiff also agreed to adjudicate any claims arising out of or relating to the agreement on an individual basis, and thus, she cannot serve as a class representative.

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

Consequently, Plaintiff's claim in the instant action is subject to the arbitration and class waiver provisions in the rental agreement. As such, Defendants move to compel individual arbitration, move to dismiss Plaintiff's class action claim, and request that this action be stayed pending resolution of the arbitration proceedings.

## II. FACTS

According to the Complaint, Defendants offered Plaintiff a written rental agreement (the "Housing Agreement") on April 1, 2022, for a dwelling unit in Ion Lincoln Park, which is owned by Fullerton and managed by Scion. (Exhibit A: *Plaintiff's Complaint*, at ¶¶ 3-4, 8; Exhibit A-1: *The Housing Agreement*, p. 1). Plaintiff signed the Housing Agreement on April 19, 2022, and Fullerton's authorized agent signed it on April 26, 2022. (Exhibit A-1, at pp. 17-18). Pursuant to the terms of the Housing Agreement, it became binding when signed by Fullerton's authorized agent. (Exhibit A-1, at p. 1).

On its first page, the Housing Agreement conspicuously advised Plaintiff that it contained an arbitration provision:

> **This Housing Agreement includes the terms below and continues through page 15, including arbitration provisions contained in paragraph 30.**

(Exhibit A-1, at p. 1 (bolding and capitals in original)). Paragraph 30 on page 8 of the Housing Agreement contained the following mandatory arbitration provision:

> **30. DISPUTE RESOLUTION; MANDATORY ARBITRATION; CLASS-ACTION WAIVER.**
>
> (a) Claims Subject to Arbitration. Except as expressly provided below, the parties agree that to the fullest extent permitted by applicable law, any dispute arising out of or relating in any way to this Agreement or a similar prior agreement, the Property or the relationship between Resident and Owner or Manager (including matters occurring prior to the date of this Agreement and disputes also involving third parties) (collectively, "Claims") will, at the election of either party, be resolved by arbitration, including any dispute about arbitrability, such as scope and enforceability.

(Exhibit A-1, at ¶ 30(a)). Paragraph 30 also contains a class action waiver:

> (f) Class Action Waiver. **THE PARTIES AGREE THAT ANY CLAIMS WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS, AND EACH WAIVES THE RIGHT TO PARTICIPATE IN A CLASS, COLLECTIVE, PAGA, OR OTHER JOINT ACTION WITH RESPECT TO THE CLAIMS.**

FILED DATE: 9/13/2022 9:29 AM 2022CH04059

(Exhibit A-1, at ¶ 30(f)). Notably, Plaintiff's electronic signature appears on every page of the Housing Agreement, including pages 1 and 8 which contain the mandatory arbitration and class action waiver provisions. (*See* Exhibit A-1).

On April 29, 2022, Plaintiff filed putative class claims against Defendants. (*See generally*, Exhibit A). Plaintiff claims that Defendants failed to attach to Plaintiff's Housing Agreement (and to the putative class' housing agreements) the then-current version of the "separate summary" describing the respective rights, obligations, and remedies of landlords and tenants with respect to security deposits, including the applicable interest rate as well as the rate for each of the prior two years, described in Section 5-12-170 the RLTO. (*See* Exhibit A, at ¶ 13). Plaintiff maintains that this alleged failure amounts to a violation of the City of Chicago Residential Landlord and Tenant Ordinance, Municipal Code Title 5, Chapter 12, *et seq*. (*See* Exhibit A, at ¶¶ 26-30)

Because a binding mandatory arbitration agreement exists, Defendants file this motion to compel arbitration and stay the proceedings until arbitration can be completed. Defendants also move to dismiss the class claims because the Housing Agreement contains a valid and enforceable class waiver provision.

## III. ARGUMENT

### A. The Applicable Standard.

The Federal Arbitration Act ("FAA"), which applies to both federal and state court proceedings, requires a court to compel arbitration where, as here, a contract provides for it. *See* 9 U.S.C. § 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable. . . ."); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26-27 (1983) (noting applicability of FAA to federal and state court

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

proceedings); *Geldermann, Inc. v. Stathis*, 177 Ill. App. 3d 414, 420 (1st Dist. 1988) (same). Under the FAA, federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability of arbitration agreements. *Id.* The FAA promotes a "liberal federal policy favoring arbitration agreements," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24; *see also Perry v. Thomas*, 482 U.S. 483, 490-91 (1987) (noting arbitration agreements falling within the scope of the FAA "must be 'rigorously enforce[d]'"). In short, the "overarching purpose of the FAA, evidenced in the text of Sections 2, 3, and 4 is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.*

Section 4 of the FAA "requires courts to compel arbitration in accordance with the terms of the agreement upon the motion of either party to the agreement." *Id.* The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). In light of this strong pro-arbitration policy, any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration. *See, e.g.*, *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25; *Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 181 Ill. 2d 373, 382-83, *cert. denied*, 525 U.S. 961 (1998). The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

Section 2-619 of the Illinois Code of Civil Procedure is the appropriate vehicle to bring a motion to compel arbitration and dismiss or stay an action based on an affirmative matter: the exclusive remedy of arbitration. *Tang Chung Wah v. Grant Thornton Int'l Ltd.*, 2014 IL App (1st)

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

1131808-U, ¶ 51 (citing *Sturgill v. Santander Consumer USA, Inc.*, 2016 IL App (5th) 140380, ¶ 21).

### B. The Housing Agreement's Mandatory Arbitration Provision Should Be Enforced.

Under the FAA, arbitration must be compelled where, as here: (1) a valid, enforceable agreement to arbitrate exists; and (2) the claims at issue fall within the scope of that agreement. *See, e.g., Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Sharif v. Wellness Int'l Network, Inc.*, 376 F.3d 720, 726 (7th Cir. 2004).

#### 1. The Arbitration Agreement Is Valid and Enforceable.

An arbitration agreement governed by the FAA is presumed to be valid and enforceable. *See Shearson/Am. Express, Inc.*, 482 U.S. at 226 (1987); *Mitsubishi Motors Corp. v. Solver Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985). Consequently, the Housing Agreement's mandatory arbitration provision is presumed to be valid and enforceable.

#### 2. Plaintiff's Claims Fall Within the Scope of the Valid and Enforceable Arbitration Agreement.

Once it is determined that an agreement to arbitrate is valid, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986); *see Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998) (any doubts concerning the scope of an arbitration clause and the issues arbitrable thereunder should be resolved in favor of arbitration). Further, where the clause in question is broad, as is the case here, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs.*, 475 U.S. at 650; *accord Exelon Generation Co., LLC v. Local 15, Intern.*

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

*Broth. of Elec. Workers, AFL-CIO*, 540 F.3d 640, 646 (7th Cir. 2008). The Seventh Circuit has considered similarly broad arbitration language providing for arbitration of "any controversy or claims arising out of or relating to [the Arbitration] Agreement," stating that these types of arbitration provisions are "extremely broad and capable of expansive reach." *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc*., 174 F.3d 907, 909 (7th Cir. 1999).

Here, the arbitration provision extends to "*any* dispute arising out of or relating in any way to [the Housing] Agreement . . . or the relationship between Resident and Owner or Manager (including matters occurring prior to the date of [the Housing] Agreement) . . . (collectively, 'Claims')." (Exhibit A-1, at ¶ 30(a)). Plaintiff's complaint is brought under the RLTO, which establishes the rights and obligations of the landlord and the tenant in the rental of Chicago apartments, i.e., it relates to the relationship between Plaintiff as the tenant and Defendants as the alleged landlord. RLTO, at § 5-12-010; (*see also* Exhibit A, at ¶¶ 3-4, 8). Moreover, the crux of Plaintiff's claim is that Defendants failed to attach the then-current version of the security deposit-related summary to the Housing Agreement, i.e., it is a dispute arising out of and relating to the content (or purported lack thereof) of the Housing Agreement. (*See* Exhibit A, at ¶¶ 13, 26-30).

Accordingly, the broad language of the arbitration provision in this case demonstrates that the arbitration provision clearly encompasses Plaintiff's claim.

### C. Plaintiff's Claims Must Be Resolved on an Individual Basis so Her Class Claims Must Be Dismissed.

The FAA requires that arbitration agreements must be enforced as written. 9 U.S.C. § 2; *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011) ("The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'"). Thus, "the parties may agree to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit with whom a party will arbitrate its disputes." *Id.* at 1748-

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

49 (citations omitted); *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010). "Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *AT&T Mobility*, 131 S. Ct. at 1752; *Howsam v. Dean-Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

Where the agreement contains a specific prohibition of class-wide arbitration, as is the case here, there can be no class-wide arbitration. *See Caudle v. Am. Arbitration Ass'n*, 230 F.3d 920, 921 (7th Cir. 2000) ("A procedural device aggregating multiple persons' claims in litigation does not entitle anyone to *be* in litigation; a contract promising to arbitrate the dispute removes the person from those eligible to represent a class of litigants.") (emphasis in original)).

In this case, the Housing Agreement specifically provided that "**THE PARTIES AGREE THAT ANY CLAIM WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS, AND EACH WAIVES THE RIGHT TO PARTICIPATE IN A CLASS, COLLECTIVE, PAGA, OR OTHER JOINT ACTION WITH RESPECT TO THE CLAIMS.**" (Ex. A-1, at ¶ 30(f) (emphasis in original)). By signing the Housing Agreement, Plaintiff agreed to these express terms and as such, she is ineligible to represent a class of litigants in state court.

Accordingly, because Plaintiff agreed to the express terms of the Housing Agreement, which includes the class waiver provision, the Court must enforce it as written. Therefore, this Court must compel individual arbitration of Plaintiff's RLTO claim against Defendants and dismiss Plaintiff's class action claims.

**D. The Action Must Be Stayed Pending Arbitration.**

Section 3 of the FAA provides that, where a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court shall stay the action "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; s*ee AT&T Mobility LLC*, 131 S. Ct. at 1478; *Halim v. Great Gatsby's Auction Gallery*, 516 F.3d 557, 561 (7th Cir.

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

2008). Accordingly, the Court should compel the parties to arbitrate and should, at a minimum, stay the case.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Honorable Court grant its motion to compel individual arbitration, dismiss the class claim, and stay proceedings pending the completion of arbitration.

Dated: July 13, 2022

Respectfully submitted,

By: /s/ James B. Hiller

James B. Hiller, (#6277661)
Katherine Decker (#6323799)
Gordon Rees Scully Mansukhani, LLP
One North Franklin, Suite 800
Chicago, IL 60606
Ph: 312-980-6773
jhiller@grsm.com
kdecker@grsm.com
*Attorneys for Defendants*

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, states that on July 13, 2022, I caused a true and complete copy of the foregoing document, *Defendants' Motion to Compel Individual Arbitration, Dismiss Plaintiff's Class Claims, and Stay Proceedings*, to be electronically filed with the Clerk of Court using the electronic filing system, which will automatically send email notification of such filing to all attorneys of record including the following:

Jeffrey Sobek
Firm No. 48317
JS Law
29 E. Madison Street, Suite 1201
Chicago, Illinois 60602
Telephone (312) 756-1330
jeffs@jsslawoffices.com
*Attorneys for Plaintiff*

Respectfully submitted,

By: /s/ James B. Hiller______________
James B. Hiller, (#6277661)
Katherine Decker (#6323799)
Gordon Rees Scully Mansukhani, LLP
One North Franklin, Suite 800
Chicago, IL 60606
Ph: 312-980-6773
jhiller@grsm.com
kdecker@grsm.com
*Attorneys for Defendants*

FILED DATE: 9/13/2022 9:29 AM 2022CH09059

# EXHIBIT A

FILED
4/29/2022 8:08 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH04059
Calendar, 10
17699197
FILED DATE: 4/29/2022 8:08 AM 2022CH04059

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

BUXTON, SLOANE,
Individually and on behalf all others similarly situated,

Plaintiff,

v.

THE SCION GROUP LLC and
1237 FULLERTON LLC,

Defendants.

No. 2022CH04059

Class Action

Cal./Rm.

Judge:

**CLASS ACTION COMPLAINT**

Plaintiff, Sloane Buxton, individually and on behalf of all others similarly situated, ("Plaintiff") by and through Plaintiff's attorneys, JS Law, states as follows for Plaintiff's Complaint against Defendants, 1237 Fullerton LLC and The Scion Group LLC (herein collectively referenced as "Defendants").

**INTRODUCTION**

1. This is a class action against Defendants for violating the City of Chicago Residential Landlord and Tenant Ordinance, Municipal Code Title 5, Chapter 12, *et seq.* ("RLTO"). As more fully explained below, Defendants failed to attach to Plaintiff's and the class's written rental agreements the *then current* separate summary describing the respective rights, obligations and remedies of landlords and tenants with respect to security deposits, *including the new interest rate as well as the rate for each of the prior two years*, required by Section 5-12-170 the RLTO (the "RLTO Interest Rate Summary").

**THE PARTIES**

2. At all times relevant Plaintiff resided in Chicago, Cook County, Illinois.

FILED DATE: 9/29/2022 9:08 AM 2022CH09059

3. Defendant 1237 Fullerton LLC is an Illinois company registered with the Illinois Secretary of State. 1237 Fullerton LLC is the owner of the six-story residential apartment building located at 1237 West Fullerton Ave., Chicago, IL 60614, commonly known as "Ion Lincoln Park."

4. Defendant The Scion Group LLC is an Illinois company registered with the Illinois Secretary of State. The Scion Group LLC is the property manager of the six-story residential apartment building located at 1237 West Fullerton Ave., Chicago, IL 60614, commonly known as "Ion Lincoln Park." The website for The Scion Group LLC, thesciongroup.com/about/, states in 2021:

> Scion becomes the global leader in purpose-built, off-campus student housing, operating 117 communities in 72 campus markets. The team of over 1,700 employees serves nearly 77,000 residents across the United States.

5. Ion Lincoln Park consists of hundreds of residential dwelling units occupied by hundreds of tenants.

6. All Defendants are landlords of Plaintiff and the putative class as defined by the RLTO during the relevant timeframe.

**JURISDICTION AND VENUE**

7. Jurisdiction and venue are proper in this Court because this action arose out of: (i) business transacted by Defendants in Cook County, Illinois and (ii) violations of Chicago municipal ordinances in Cook County, Illinois.

**FACTS COMMON TO ALL COUNTS**

8. On April 1, 2022, Defendants offered Plaintiff the written rental agreement, titled "Housing Agreement," for a dwelling unit in Ion Lincoln Park. The Housing Agreement is attached hereto as **Exhibit 1**.

FILED DATE: 9/29/2022 9:08 AM 2022CH09059

9. Attached to the Housing Agreement as pages 10-15 was (a) the summary of the general terms of the RLTO prepared by the City of Chicago in 2020 and also (b) the separate summary of the interest rate provisions of the RLTO describing the respective rights, obligations and remedies of landlords and tenants with respect to security deposits prepared by the City of Chicago in 2020 (the "2020 Interest Rate Summary"), i.e. the summary did not include the new interest rate as well as the rate for each of the prior two years.

10. The Housing Agreement is a standard form written residential rental agreement.

11. The Housing Agreement was offered electronically and signed electronically. The last two pages of the Housing Agreement is a document titled "Signature Detail" that provides the exact date and time Plaintiff and Defendants signed the Housing Agreement.

12. The standard form verbiage "SEE BELOW FOR ELECTRONIC SIGNATURE" on the first page of the Housing Agreement evidences Defendants' standard practice of offering the Housing Agreement electronically to prospective tenants.

13. The then current RLTO Interest Rate Summary for 2022, i.e. the summary prepared by the City of Chicago in 2022 that included the new interest rate as well as the rate for each of the prior two years, was not attached to the Housing Agreement when it was offered to Plaintiff.

## CLASS ALLEGATIONS

14. Plaintiff brings this action individually and on behalf of a class of others similarly situated. This action may properly be maintained as a class action pursuant to the provisions of 735 ILCS 5/2-801.

15. Plaintiff's proposed class is designated as the "Ordinance Summary Class."

FILED DATE: 9/29/2022 9:28 AM 2022CH09059

16. The Ordinance Summary Class consists of all persons who satisfy the following criteria:

a. They were a tenant or prospective tenant in 2021 and 2022; and

b. Who was offered the standard form Housing Agreement offered to Plaintiff, inclusive of the 2020 Interest Rate Summary instead of the *then current* RLTO Interest Rate Summary that include the new interest rate as well as the rate for each of the prior two years.

17. Class members of the class are so numerous that individual joinder of all members is impractical, and while the exact number of the class members is unknown at the present time, it is ascertainable by appropriate discovery, and the class exceeds 40 class members.

18. Class membership can be ascertained through discovery, particularly due to Defendants' common business practice of offering the Housing Agreement electronically.

19. Class membership can be ascertained through discovery because the electronic platform utilized to offer the Housing Agreement provides a reliable source to determine exactly who was offered the Housing Agreement, the exact date and time the Housing Agreement was signed and the exact documents attached to each Housing Agreement when it was offered.

20. Common questions of law and fact exist as to all class members of the class and predominate over any questions that affect only individual class members.

The questions of law and fact that are common to the Ordinance Summary Class and that predominate include, but are not limited to:

a. Whether Defendants offered to prospective tenants and tenants the standard form Housing Agreement offered to Plaintiff, inclusive of the 2020 Interest Rate Summary instead of the then current RLTO Interest Rate Summary that included the new interest rate as well as the rate for each of the prior two years; and

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

b. Whether the RLTO requires Defendants to have attached to the Housing Agreement the then current RLTO Interest Rate Summary that included the new interest rate as well as the rate for each of the prior two years.

21. Plaintiff will fairly and adequately protect the interests of the members of the class in that Plaintiff's claims are typical of the claims of the class and Plaintiff does not have any interests that are adverse to the other class members.

22. Plaintiff has retained competent counsel experienced in handling class actions and actions involving violations of the RLTO. Neither Plaintiff nor Plaintiff's counsel have any interests which might cause them not to vigorously prosecute this action.

23. Plaintiff's claims are based on similar facts and the same legal theories as those of the class members Plaintiff seeks to represent.

24. Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence and effort. Class treatment is especially appropriate for the current controversy because it is the only practical means for class members to receive redress given that the individual claims are small in amount and the class members are students with limited financial resources and substantially less sophistication than Defendant, who is the largest provider of student housing in the entire United States.

**COUNT I – FAILURE TO ATTACH A RLTO SUMMARIES**

25. Plaintiff repeats and realleges Paragraphs 1-24 as Paragraph 25, and states that this Count is brought by Plaintiff individually and on behalf of the Ordinance Summary Class.

FILED DATE: 9/29/2022 9:28 AM 2022CH09059

26. Section 5-12-170 of the RLTO requires landlords to attach a copy of the then current RLTO Summaries to every written rental agreement or renewal when initially offered to a tenant or prospective tenant. Specifically the RLTO provides:

> The commissioner of housing and economic development shall prepare a summary of this chapter, describing the respective rights, obligations and remedies of landlords and tenants hereunder, and shall make such summary available for public inspection and copying. The commissioner shall also, after the city comptroller has announced the rate of interest on security deposits on the first business day of the year, prepare a separate summary describing the respective rights, obligations and remedies of landlords and tenants with respect to security deposits, *including the new interest rate as well as the rate for each of the prior two years.* The commissioner shall also distribute the new rate of security deposit interest, as well as the rate for each of the prior two years, through public service announcements to all radio and television outlets broadcasting in the city. A copy of such summary shall be attached to each written rental agreement when any such agreement is initially offered to any tenant or prospective tenant by or on behalf of a landlord and whether such agreement is for a new rental or a renewal thereof. Where there is an oral agreement, the landlord shall give to the tenant a copy of the summary.
>
> The summary shall include the following language:
>
> "The porch or deck of this building should be designed for a live load of up to 100 pounds, per square foot and is safe only for its intended use. Protect your safety. Do not overload the porch or deck. If you have questions about porch or deck safety, call the City of Chicago non-emergency number, 3-1-1."
>
> If the landlord acts in violation of this section, the tenant may terminate the rental agreement by written notice. The written notice shall specify the date of termination no later than 30 days from the date of written notice. If a tenant in a civil legal proceeding against his landlord establishes that a violation of this section has occurred, he shall be entitled to recover $100.00 in damages.

27. The 2020 Interest Rate Summary instead of the then current RLTO Interest Rate Summary was attached to the Housing Agreement when it was offered to Plaintiff.

28. Defendants policy and practice since the beginning of 2021 was to attach the 2020 Interest Rate Summary instead of the then current RLTO Interest Rate Summary to the Housing Agreement when it was offered to tenants and prospective tenants of Ion Lincoln Park.

FILED DATE: 8/29/2022 9:08 AM 2022CH04059

29. Defendants' policy and practice to attach the 2020 Interest Rate Summary instead of the then current RLTO Interest Rate Summary to the Housing Agreement when it was offered to tenants and prospective tenants of Ion Lincoln Park violated RLTO §5-12-170.

30. Under the RLTO, if a landlord violates Section 5-12-170, the tenant or prospective tenant is entitled to recover $100 per violation and terminate the lease with up to 30 days notice.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully request this Court to:

a. Certify the Ordinance Summary Class;

b. Appoint Plaintiff as class representatives of the Ordinance Summary Class;

c. Appoint JS Law as class counsel;

d. Enter judgment for Plaintiff and the Ordinance Summary Class against Defendants for the amounts specified in §5-12-170 of the RLTO;

e. Order Defendants to permit Plaintiff and the Ordinance Summary Class to terminate their rental agreements by written notice as provided in §5-12-170 of the RLTO;

f. Award attorney's fees, litigation expenses and costs as specified in §5-12-180 of the RLTO; and

g. Order such other further relief as the Court deems equitable, including prejudgment interest.

Dated: April 28, 2022

Respectfully submitted,

SLOANE BUXTON, individually and on behalf of all others similarly situated,

By: */s/ Jeffrey S. Sobek*
One of Plaintiff's attorneys

FILED DATE: 9/29/2022 9:28 AM 2022CH09059

Firm No. 48317
JS Law
29 E. Madison Street, Suite 1201
Chicago, Illinois 60602
Telephone (312) 756-1330
jeffs@jsslawoffices.com

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

# **EXHIBIT 1**

FILED
4/29/2022 8:08 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH04059
Calendar, 10
17699197

FILED DATE: 4/29/2022 8:08 AM 2022CH04059

ion LINCOLN PARK

# HOUSING AGREEMENT

This Housing Agreement is entered into on **Apr 01, 2022**, between **Sloane C Buxton** **("Resident")** and **1237 Fullerton LLC**(“**Owner**”) and is binding only when signed by Owner or its agent.

**NUMBER OF BEDROOMS: 1**

**Start Date:** September 01, 2022 | **Unit Type: 4 BEDROOM, 2 BATH**

**End Date:** August 10, 2023 | **Initial Apartment/Bedroom #:** TBA

**Housing Installment Rate** **$1,029.00**

**Utility/Amenity Fee** **$99.00**

**Payment Schedule:**

**12 payments of $1,128.00 each, due on the dates shown in paragraph 2**

**Total Rent:** **$13,536.00**

**Administrative Fee:** **$300.00** **Security Deposit:** **None**

Owner’s address (including for payment, service of process and notices): **1237 West Fullerton Ave., Chicago, IL 60614**. The “person” authorized to enter into rental agreements on behalf of Owner, to manage the Property and to act for and on behalf of the Owner for the purpose of service of process and of receiving and receipting for notices and demand is the Manager: The Scion Group LLC, 1237 W. Fullerton Ave., Chicago IL 60614, 773-395-4500.

This Housing Agreement grants a limited license to Resident to access and make personal residential use of one (1) assigned bedroom space (unless multiple bedrooms are expressly listed above, as further described in paragraph 29) in an apartment (and adjoining bathroom if applicable), together with its standard installed fixtures and furnishings, plus shared use of accompanying unit common areas, fixtures, furnishings and appliances in the assigned apartment, at the residential property known as “**Ion Lincoln Park**,” located at 1237 W. Fullerton Ave., Chicago, Illinois (the “**Property**”) between the Start Date and End Date listed above. This Housing Agreement is not a lease and no tenancy, leasehold, possessory or other property interest in any specific apartment or bedroom is created. Resident is initially assigned to the bedroom space and apartment identified above (see floor plan available in the management office or at ion-lincolnpark.com for designation of bedroom spaces); if the space is not immediately identified or assigned, or if it is identified as “to be assigned,” “TBD” or “TBA,” this Agreement is binding and Owner will assign an apartment and bedroom matching the identified unit type prior to move-in. Resident will occupy only the assigned bedroom space within the apartment. Resident will not allow another person to use a bedroom space or apartment in place of or in addition to Resident, whether for compensation or otherwise, and will not offer to do so through advertising or listings. Owner will attempt to assign the other bedroom(s) to person(s) requested by Resident but may contract with others of Owner’s choosing for the other bedroom(s) within the apartment, without notice to Resident. If this Housing Agreement is executed by more than one person identified as “Resident,” then all obligations are the joint and several obligations of all such persons and “Resident” will refer to all such persons both individually and collectively. **This Housing Agreement includes the terms below and continues through page 15, including arbitration provisions contained in paragraph 30.**

*Note: Resident agrees to provide any one of the following within seven days after signing and prior to move-in (or, if Resident is already in possession of the bedroom space, then prior to the Start Date): (1) a signed Guaranty by a Guarantor acceptable to Owner, (2) a guaranty policy purchased from a third-party provider approved by Owner, or (3) prepayment of the final two installments indicated above. This obligation is an element of Resident’s performance and not a condition precedent. Failure to provide one of the above will not release Resident from financial responsibility but will entitle Owner, at its option, to delay move-in or terminate for non-performance, following written notice.*

**I, as Resident, have carefully read and fully understand and voluntarily sign this Housing Agreement and acknowledge that once fully signed, this is a binding contract upon me and all permitted successors.**

SEE BELOW FOR ELECTRONIC SIGNATURE
**Signature of Resident**

**ACCEPTANCE BY OWNER:**

**1237 FULLERTON LLC**

**By:** SEE BELOW FOR ELECTRONIC SIGNATURE
**Its Authorized Agent**

**This Housing Agreement (“Agreement”) includes the following terms:**

1. **Term**. Resident will have access to the Property and the assigned bedroom space and apartment as of 10:00 A.M. on the Start Date, and this access will end as of 12:00 Noon on the End Date (the “**Term**”), unless early arrival or late departure is approved by Owner in writing, at additional cost to the Resident.

[1] Sloane C Buxton [16] Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

2. **Payment.** Resident accepts financial responsibility for the full Term of the Agreement, regardless of whether the assigned bedroom space is occupied for the full Term or at all. Resident agrees to make full and prompt payment to Owner according to the payment schedule specified below, without demand of Owner. Payment for unpaid utility charges and any other charges then lawfully due may at Owner's option be made part of rent and due and payable together with rent. **The Total Rent stated above is a fixed price for the entire Term and is payable in equal installments for convenience; there is no proration or adjustment for any partial month.** Payment may be made by personal check, money order or cashier's check, or in Owner's discretion by credit card, check card, electronic check, or by direct bank transfer, provided that (i) Owner reserves the right to charge processing fees for such payment methods, and (ii) if payment of the first regular installment is not received at least three business days prior to move-in, Owner may require this payment be made with certified funds. If any payment is returned unpaid, Owner may require Resident to make future payments by certified funds. Payment (including by mail) is deemed made only when actually received by Owner or its agent, subject to clearance of funds. Resident's payment obligation is a promise by Resident which is independent from all of Owner's and its agent's promises, duties and obligations. Each payment not received within two calendar days after the date due will be increased by **a late charge of $10 for the first $500 of any unpaid balance plus 5% of any additional amount of unpaid balance beyond $500.** To cover Owner's added costs for processing of payments that are dishonored or returned due to insufficient funds or other reason, each such payment will be increased by $35 as a returned payment charge and will not be considered paid until valid payment has been received. Acceptance by Owner of any payment shall not constitute a waiver of Owner's right to terminate this Agreement and/or claim any damages.

Payment will be due without proration as follows:

| | | | |
|---|---|---|---|
| 1st day of September 2022 | $1,128.00 | 1st day of March 2023 | $1,128.00 |
| 1st day of October 2022 | $1,128.00 | 1st day of April 2023 | $1,128.00 |
| 1st day of November 2022 | $1,128.00 | 1st day of May 2023 | $1,128.00 |
| 1st day of December 2022 | $1,128.00 | 1st day of June 2023 | $1,128.00 |
| 1st day of January 2023 | $1,128.00 | 1st day of July 2023 | $1,128.00 |
| 1st day of February 2023 | $1,128.00 | 1st day of August 2023 | $1,128.00 |

3. **Assignments.** Apartment and bedroom space assignments are made, and may be changed, only by Owner or its agent. **Change requested by Resident:** Resident may request to change assignments to a different apartment. Such change requests by the Resident are only effective upon written approval by Owner in its discretion, subject to the following preconditions: (a) Resident must be in good standing under the Housing Agreement; (b) Resident must prepay a $200 reassignment fee (refunded if the request is declined); (c) Resident and Owner must sign a written confirmation of the change in assignment, including Resident's agreement to pay the prevailing rate for the new assignment, pro-rated to the date scheduled for relocation; and (d) relocation must be completed within 48 hours or charges will apply on both spaces. **Change by Owner:** Owner reserves the right to relocate Resident to another equivalent bedroom space or apartment at the Property for any reason upon at least three days' notice. In such case, if the new Owner-assigned space carries a lower rate, Resident's charges will be pro-rated and reduced accordingly; if the new Owner-assigned space carries a higher rate, Resident will continue to pay the rate under this Agreement and will not be charged the higher rate. Failure to relocate within the time provided by Owner will be considered a material breach and may also result in charges applying for both spaces.

4. **Termination; Subletting/Delegation.** Once this Agreement is signed by Owner and Resident, Resident may terminate by providing written notice to Owner and by fully vacating the premises, provided that **in all cases Resident will remain fully responsible for the Total Rent that would have accrued under this Agreement, through the end of the full original Term**. No exception can be made for financial hardship, academic changes, family matters, medical issues, roommate conflict or any other reason. Any charges associated with damage to a bedroom space, apartment or the Property or Resident's failure to vacate completely upon termination, will be payable in addition to the foregoing amount. After such termination, Owner will use its commercially reasonable efforts to contract with other individuals for the use of all available bedroom spaces, including the bedroom space vacated by Resident; if and when all such available bedroom spaces at the Property are fully assigned and occupied and no bedroom spaces remain vacant, Resident will receive a credit equal to the remaining charges that would have accrued under this Housing Agreement, prorated from such date through the end of the original term hereof, less a $200 cancellation/marketing fee which is in addition to all other charges provided herein. Resident understands that due to the nature of student housing, successful mitigation is highly unlikely; therefore, Resident will be responsible for remaining scheduled rent, subject to potential credit for mitigation as described above, and Owner may apply all prepaid amounts (if any) toward Resident's obligation. Resident may not assign or transfer Resident's interest in this Agreement, or any part hereof, nor sublet Resident's right to use the Property, apartment or bedroom space, or any part thereof, nor provide keys to any other person. However, in Owner's sole discretion, Resident may delegate his or her right to use the Property to another person pursuant to Owner's

2 Sloane C Buxton 17 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

approved delegation form, signed by all parties, if Resident is in good standing under the Agreement and pays to Owner a delegation fee of $200.

5. **Move-in; Inspection; Delay.** Before Resident may access or occupy the premises, all required administrative fees, other annual charges and all installments then due must be paid in full with cleared funds and guaranty requirements satisfied. Immediately preceding Resident's taking possession of the assigned bedroom space (and any re-assigned bedroom space), Resident will conduct an inspection of the assigned bedroom space and apartment and will note on the Check-In/Check-Out Inspection Report ("Inspection Report"), which upon completion and approval by Owner will become part of this Agreement, any defects, damage or other conditions observed. Owner's approval of the Inspection Report will be conclusive evidence of existing defects, damage and conditions and of a full inventory of fixtures. If Resident fails to conduct the inspection and/or provide a signed Inspection Report to the Owner, then Resident waives the right to dispute any assessment of damages to the bedroom space and/or apartment on the basis of a pre-existing condition. Upon Resident's move-out (or, as applicable, following the move-out of all residents of an apartment) at the termination of this Agreement, Owner will note the then-present condition of the assigned bedroom space and apartment, including all appliances and fixtures, and any damages incurred and/or extraordinary cleaning deemed necessary by Owner or extraordinary wear as determined by Owner. Resident will promptly pay all costs of restoring the bedroom space and apartment to the same condition upon move-in, less normal wear, and is encouraged to inspect the bedroom space and apartment with Owner's representative prior to move-out by making an appointment during business hours at least two days in advance. Resident acknowledges that except as provided in the Inspection Report, each bedroom space and apartment are being delivered in "as-is" condition, and Resident's acceptance of the assigned bedroom space and apartment at the beginning of the Term constitutes Resident's acknowledgment that the bedroom space and apartment and all fixtures are in good repair and condition. Owner will not be responsible for any damages or consequences suffered by Resident as a result of Owner's inability to timely deliver possession of an apartment or bedroom space to Resident on the anticipated Start Date; in such event, the rent payable will be abated until Owner renders possession and such delay will not extend or decrease the term or change the End Date. If such delay extends beyond 30 days, Resident may terminate this Agreement upon written notice to Owner.

6. **Required Liability Insurance; Personal Property**. During the full term of the Housing Agreement, Resident agrees to obtain and maintain at Resident's expense a policy of personal liability insurance (i.e., renter's liability insurance) from a licensed insurance carrier in the United States, with coverage of at least $100,000 per occurrence at actual replacement cost, covering Owner's losses of any kind arising from fire, smoke or water and caused by Resident's negligence and/or by Resident's animal. The liability insurance requirement and the existence or limits of any such insurance will not reduce or supersede Resident's obligations under this Housing Agreement, except to the extent Owner charges and Resident pays for a waiver of this insurance requirement as provided below. Resident is not obligated to purchase insurance from any specific provider and may arrange its own personal liability insurance policy from any insurer of Resident's choosing meeting the requirements of this paragraph, in which case Resident agrees to provide written proof of the required personal liability insurance coverage, including causing Owner and Manager to be listed as named interested parties on such insurance coverage, by mailing the proof of insurance to P.O. Box 18999, Atlanta, GA 31126-1399. Owner will provide instructions prior to move-in for submitting proof of insurance or purchasing a compliant insurance policy; Resident's failure to comply with these insurance requirements will be a breach by Resident with Owner reserving its remedies but will not give Resident any right of termination. If Resident fails or chooses not to provide sufficient proof of compliant personal liability insurance to Owner by the Start Date, or if Resident's insurance is cancelled during the term of this Housing Agreement, then Owner may, at its option, waive Resident's obligation to provide such insurance and obtain its own coverage in Owner's name for the same limited risks (up to $100,000 per occurrence from fire, smoke or water damage caused accidentally by Resident's negligence and/or by Resident's animal) at Owner's expense; in such case, Resident agrees to reimburse Owner at the cost of $12.00 per installment as additional Rent during the remaining term of this Agreement, of which Owner will retain $5.00 per installment as an administrative fee and use the remaining $7.00 per installment to procure such insurance for itself. This waiver is not insurance, does not release Resident from liability for other damage or causes and does not cover Resident's personal property. Owner strongly recommends that Resident maintain insurance covering Resident's personal property or belongings, which Resident may elect to purchase. Neither Owner nor any of its employees, representatives or agents assumes any liability, directly or indirectly, for loss or damage to the personal property of Resident or others by fire, theft or any other cause. Any personal property remaining in the bedroom space and/or apartment at the end of the Term or after earlier termination of this Agreement will be considered abandoned by Resident and may be disposed of by Owner at the risk and expense of Resident, with Owner maintaining a landlord's lien for unpaid rent as provided by law. Owner will not be liable or responsible for storage or disposition of the Resident's personal property. If there are multiple individuals comprising Resident, then all references to and obligations of Resident in this paragraph 8 will apply to each such individual, separately.

7. **Responsibility for Damage. Resident is solely responsible for any damage, defacement or loss within the assigned bedroom space. All assigned residents of an apartment are jointly and severally responsible for any damage, defacement or loss to common areas, other parts of the facility, fixtures or appliances, except for the portion of damages over $100,000 where it is finally established that Resident or one or more other residents of the apartment were solely at fault for the entire loss, in which case such person(s) will be solely responsible.** Resident is fully responsible for the conduct of Resident's guests, visitors, licensees and invitees ("Guests"), including without limitation harm to individuals or damage or defacement of

[3] Sloane C Buxton [18] Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

any part of the Property or its fixtures or property of third parties (including other residents) by such Guests. **All loss or damage in connection with any fire arising from or contributed to by the negligence or intentional act of Resident or his/her Guests will be the sole responsibility of Resident, regardless of insurance coverage or any applicable deductible.**

**8.** **Prohibitions.** Firearms, weapons, explosives or illegal drugs of any kind are strictly prohibited anywhere on or about the Property, including individual apartments and bedroom spaces (except government-issued service weapons carried by duly deputized law enforcement personnel). No gas or charcoal grill, nor any other open flame cooking or heating device, may be stored or used on any balcony, deck and/or patio at the Property, except on the ground at least 25 feet from any building. Resident will, and will cause Guests to: (a) comply with all federal, state, county and city laws, ordinances and/or regulations, including without limitation those relating to the consumption of alcoholic beverages; (b) not act in any way that endangers the Property or the safety of any person, or that is intended to facilitate criminal activity; (c) not engage in disruptive conduct or allow any noise loud enough to be heard outside the apartment or in neighboring apartments assuming doors and windows were closed; (d) not place or keep any trash outside of the apartment, including on any balcony, deck or patio; (e) not damage or take any property belonging to others without express consent; (f) not tamper or interfere with smoke detectors; (g) not injure the reputation of the Property or its residents, (h) not act or fail to act in any way that would cause an increase in the rate of insurance at the Property; (i) not engage in any activity which interferes with or decreases the use and enjoyment of the Property by other residents; and (j) otherwise obey the Community Policies and other rules applicable to the Property. Any single violation of any of the foregoing will be considered a material breach of this Agreement and will be good cause for immediate termination of the Agreement with all applicable charges due.

**9.** **Cleanliness; Heat; Safety; Entry.** Resident agrees to maintain the assigned bedroom space, the apartment and the common areas of the Property in a clean, safe and sanitary condition, to exercise all due care in the use of same, and to cooperate fully with the Property pest control program as requested. Resident will be responsible for the cost of treatment for bedbugs and similar pests to the extent Owner's pest control vendor reasonably determines that an infestation has originated within Resident's assigned space and during Resident's occupancy. Resident will place all trash in provided receptacles and will be responsible for the cost of cleaning the interior or exterior of the apartment if not kept in sanitary condition. Resident will at all times during cold weather keep the apartment's heat turned on, including during vacations, and will otherwise ensure that the apartment and bedroom space are heated sufficiently to at least 60ºF to prevent damage from freezing, including but not limited to frozen pipes and fixtures. Resident will be responsible for all damage anywhere at the Property resulting from failure to keep the apartment and/or bedroom space adequately heated. Owner and its agents, employees and contractors may enter any apartment and bedroom space to perform routine maintenance, inspections, showings and other ordinary functions as permitted by law, provided that Owner will attempt to provide at least two days advance notice to residents of an apartment before such entry (except for repairs performed upon request by any resident of the apartment, in which case advance notice is not required). Owner reserves the right to enter an apartment and any bedroom space without prior notice (including use of a passkey or other means of entry if locks have been changed) for emergency maintenance or repair purposes, or when there is reasonable cause to believe that a situation exists that could cause danger to life, safety, health or property. Owner may remove any item reasonably deemed to cause danger and is under no obligation to pay compensation for or to return such items.

**10.** **Residential Use; No Pets.** The bedroom space and apartment may be used solely for private residential purposes and for no other purposes. Resident may not carry on any business or other enterprise from the bedroom space or apartment, nor use any assigned phone number or Internet connections for business purposes. Resident may place no signs, placards or other advertisement of any character in the bedroom space or apartment, nor display anything in an apartment or bedroom space that is visible from outside the Property or the apartment. Resident may not store at the Property or connect to a Property electrical outlet any mobility device owned by a third party. No pets are allowed anywhere in or about the Property, except fish in small tanks to the extent approved by Owner in its sole discretion. Violation of the no-pet policy will subject Resident to mandatory deep-cleaning fees and may be considered as a termination of this Agreement by Resident, with all charges due and accelerated (to the extent permitted by law) as provided in paragraph 4.

**11.** **Utilities; Amenities.** The following utilities are included in the Total Rent set forth in this Agreement: **Electricity, water/sewer, gas, Internet access, emergency local phone and trash disposal**. Owner makes no representations and hereby disclaims any and all warranties, express or implied, with respect to any utilities provided, including but not limited to those warranties concerning merchantability and fitness for a particular purpose or use, whether made allegedly by Owner or its representatives or agents, whether in writing or otherwise, except as otherwise expressly stated in this Agreement. Owner does not warrant or guarantee the protection of Resident's privacy during operation of utilities, that such utilities will satisfy Resident's requirements, or that the operation of utilities will be uninterrupted or error free. Resident acknowledges and agrees that neither Owner nor its affiliates, agents, employees or representatives will be responsible to Resident for any non-economic, consequential, incidental, indirect or special damages, including incidental, economic or punitive damages, arising from breach of warranty, breach of contract, negligence or any other legal ground of action, or by reason of the use, discontinuation or modification of any utilities or the termination of any utilities, whether arising from Resident's use of (or inability to use) utilities, or otherwise, even if Owner has been advised of the possibility of such damage. In the event that any utility service proves defective, or is discontinued or terminated, Owner's and Manager's entire combined liability and Resident's exclusive remedy will be limited to a reimbursement

4 Sloane C Buxton 19 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

of the approximate cost of that utility incurred by Resident, prorated by the day for each day the utility service proved defective, or was discontinued or terminated, for more than 24 hours. Resident agrees to indemnify, defend and hold harmless Owner and its employees, affiliates and agents, from any and all losses, claims, damages, expenses, other liabilities and causes of action of every nature, including attorney fees, which arise, directly or indirectly in connection with: (i) violation by Resident of any laws, ordinances, regulations or rules regarding the utilities; or (ii) illegal or inappropriate use of the utilities. Any damage or loss to any utility devices during Resident's occupancy will be charged to Resident (and the other residents in the apartment, as applicable) at the replacement cost. Management will establish schedules and policies for the use of recreation facilities, amenities and other common spaces. Owner may add, remove, close (temporarily or permanently), upgrade or modify any of the recreation facilities, amenities or common spaces in Owner's discretion, without notice or compensation; provided that if this Agreement expressly includes a separate Amenity Fee, Resident's sole remedy will be limited to a pro-rata credit of such Amenity Fee for the period a covered amenity is closed or fully unavailable.

12. **Management; Community Policies.** Owner may retain employees and management agents from time to time to manage the Property, and Owner's agent may retain other employees or contractors. Resident, on behalf of himself or herself and his or her Guests, agrees to comply fully with all directions from Owner and its employees and agents, and the policies and regulations (including all amendments and additions thereto), as contained in this Agreement and Owner's Community Policies (available at **http://ion-lincolnpark.com/policies.pdf** and incorporated by reference herein), as may be published or reasonably amended by Owner from time to time.

13. **Guests; Occupancy Limits.** No more than one person may occupy a bedroom space, except for minor children for whom the Resident is the parent or legal guardian (further subject to apartment occupancy limits), with Owner's consent and with consent of apartment-mates as applicable. If Resident desires to have an Overnight Guest (any non-resident staying in any bedroom or apartment for more than three total nights in any 30-day period), then Resident must register the Overnight Guest(s) with Owner. Resident may not have Overnight Guest(s) for more than three consecutive nights, nor for more than six total nights in any 30-day period. In the event any unregistered or unauthorized Overnight Guest(s) are identified to be in or using an apartment or bedroom space, Owner may assess against the Resident a Guest Fee of $50 per day, in addition to the right of Owner to declare Resident in material breach of this Agreement and pursue other available remedies. Although Resident may have Guests from time to time, Owner reserves the right to restrict the number of persons permitted in or about an apartment at any time in Owner's discretion, to protect safety and the quiet enjoyment of other residents. All Guests may park only in overflow parking areas and no Guest's vehicle may remain at the Property for more than three days.

14. **Parking.** If "Parking Space" is selected with a corresponding rate on page 1, Owner grants to Resident a non-exclusive, undivided limited permit to use any one marked parking spot at any given time in the Property's parking garage (subject to handicap and reserved parking restrictions) for the sole purpose of parking one personal, non-commercial vehicle, and for ordinary access to and from such parking lot over marked driveways. The parked vehicle must be properly registered and licensed and may not create a safety hazard. Vehicles improperly parked or appearing abandoned may be towed at the vehicle owner's expense. Owner will reasonably clean snow and ice from driveways but is not responsible for cleaning individual parking spaces. This paragraph creates a limited use license and not a bailment. Resident assumes all risk and responsibility for damage to the vehicle and any personal property contained in it, and the vehicles or other personal property of others, in connection with any use of parking areas. Owner is not responsible for any damage to vehicles or property contained in vehicles. Owner reserves the right to revoke or restrict parking rights if Resident violates this paragraph.

15. **Safety Precautions.** Resident acknowledges that neither Owner nor any of its agents, employees or representatives has made any representations, either written or oral, concerning the safety of the Property, the bedroom space or any apartment, or the effectiveness or operability of any security devices or safety, health or security measures at the Property, the bedroom space or any apartment. Owner neither warrants nor guarantees the safety or security of residents or their Guests against any criminal or wrongful acts of third parties. Resident and his or her Guests are responsible for protecting their own respective person and property and hereby release Owner and its agents, employees and representatives for any and all damage to person and property. Resident acknowledges that security devices or measures may fail or be thwarted by criminals or by electrical mechanical malfunctions; therefore, Resident should not rely on such devices or measures and should take steps to protect himself or herself and his or her existing property as if these devices or measures did not exist. Resident agrees to immediately notify Owner's representative of any malfunctions involving locks and life-safety building components.

16. **Smoking.** Smoking or vaping inside any apartment, hallway, elevator, breezeway, stairwell, balcony, patio or other indoor or adjacent area by Resident or his or her guest(s) is prohibited. In the event that Resident or any guest smokes, burns candles, burns incense or engages in any other activity which could result in particles and/or smoke which tend to cause staining or odor on walls, carpets or other portions of the premises, soiling of ductwork that could require duct cleaning or a persistent odor in an apartment that necessitates the removal of carpet and padding despite an apparent clean appearance, all such damage and repair cost will be considered extraordinary damage beyond normal wear and tear and is the responsibility of the Resident. Therefore, Resident agrees that **any** smoking in an apartment will subject the resident(s) to a minimum deep-cleaning fee of $250, plus any additional costs of cleaning or repair in connection with smoking or other smoke-related damage.

5 Sloane C Buxton 20 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

**17. Maintenance, Alteration and Repair**

(a) Resident is responsible for and agrees to take good care of the premises, fixtures and all common areas. Resident may not remove any of Owner's property and will not perform any repairs, upgrades, painting, wallpapering, electric changes or other alterations of the premises without prior written consent from Owner. Resident will be responsible for damage from waste stoppages caused by foreign or improper objects or improper use in lines serving bathrooms, damage to fixtures, appliances, doors, windows, screens, damage from water faucets left on or from doors left open, and repairs or replacements to safety devices necessitated by misuse or damage by Resident and/or guests. Extraordinary appliances or furnishings such as satellite dishes, hot tubs, pool tables, water beds or high utility-consuming devices may not be installed or placed on the premises or anywhere at the Property without Owner's prior written consent, in its sole discretion.

(b) In the case of a malfunction of any utilities or damage by fire, water or similar cause, or any water leak, suspected mold or microbial growth, electrical problem, broken glass, broken lock or any other condition that Resident reasonably believes poses a hazard to health and safety, Resident must promptly notify Owner in writing. Owner will act with reasonable time and diligence in making repairs and reconnections; Resident may not withhold or reduce payment of rent or other charges during such time. Maintenance and repair requested by Resident will generally be performed during normal business hours, unless Owner deems the work an emergency in its discretion, in which case work may take place at any time. Owner may temporarily disconnect equipment or utilities to avoid property damage and/or to perform repairs requiring such interruption, in Owner's sole discretion. Except as otherwise provided by law, Owner will not be liable for any inconvenience, discomfort, disruption or interference with Resident use of the premises because of ongoing repairs, alterations or improvements to the premises, the apartment or the Property.

(c) Following move-in, Resident is responsible for providing and changing all light bulbs and batteries (for smoke detectors and remote controls) in the assigned apartment. A written maintenance report requesting assistance in changing these items may be submitted for maintenance staff assistance, with extra charges payable by Resident as applicable per Owner's published rates. From time to time, maintenance staff may enter the assigned apartment with or without notice to inspect and change furnace filters and to provide pest control.

**18. Breach by Resident.** Upon any breach by Resident of this Housing Agreement or a prior agreement between Resident and Owner or its affiliates, including community policies, Owner may without separate demand or notice except as provided by law, and in addition to other lawful remedies, do any one or more of the following: (i) collect any charge under this Housing Agreement or community policies, including reimbursement for costs of collection; (ii) terminate this Housing Agreement and/or Resident's right to occupy the premises, and/or institute an action for eviction; (iii) sue to collect all past due charges and/or unpaid rent and other charges which would become due through the End Date or until the bedroom space and all other bedroom spaces at the Property have been filled, with recovery by Owner of any discrepancy in rent rate and any expense incurred in obtaining the new resident contract; (iv) report any information to credit reporting agencies. Without limitation, Owner may terminate this Agreement for non-payment of rent or other charges, or upon any conduct by Resident that is prohibited by or in breach of this Agreement, or if, in the reasonable judgment of Owner, continued residency will or may be detrimental to the educational process or the health, safety and/or welfare of the other residents of the Property or any of the Property's personnel. Upon any termination as described in this paragraph: (a) Resident must fully vacate the bedroom space and apartment (including removing all personal belongings) within the time provided in the written notice given by Owner, and will have no further use of or access to the Property, the assigned apartment or bedroom space; and (b) Resident will be fully responsible for all rent and other charges as if the Agreement had been terminated by Resident as described in paragraph 4. Owner's termination for breach will not limit Owner's claim for damages resulting from Resident's breach of the Agreement. Owner's acceptance of rent or other payment following notice to vacate or during the pendency of a legal action will not waive or diminish Owner's rights under this Agreement or statutory law unless separately and expressly agreed by Owner.

**19. Assumption of Risks.** Resident ASSUMES ALL RISKS associated with use of the Property and, to the full extent permitted by law, agrees to hold harmless, release, defend and indemnify Owner and its affiliates, members, partners, officers, agents and its and their respective employees ("Released Parties") from all loss, liability and/or claims for injury, illness or death to persons or damage or theft to property arising in whole or in part from: (i) the negligent acts, omissions or intentional wrongdoing of Resident or his/her Guests; (ii) fire; or (iii) the use, occupancy, presence at or other interaction with the Property or any part or contents thereof, by Resident or his or her Guests, including without limitation those injuries and damages caused by a Released Party's alleged or actual negligence or breach of any express or implied warranty. Resident agrees to indemnify each Released Party for any injuries to Resident or any Guest or other person or property that arises in connection with occupancy or use by Resident or any Guest of Resident. Resident further agrees to reimburse, indemnify and hold harmless Released Parties from any and all claims, lawsuits, actions, costs, damages (including liquidated damages as specified) or losses, including reasonable attorneys' fees and costs and expenses, that a Released Party incurs or may incur as a result of any breach of this Agreement by Resident. The forgoing will be binding to the fullest extent permitted by law and will not apply to liability of Owner specifically arising under law.

**20. Abandonment.** If the assigned bedrooms space or an apartment is abandoned, Owner may, without notice, secure the bedroom space and/or apartment with new locks, to store or dispose of any personal property left in the bedroom space or apartment by

6 Sloane C Buxton 21 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

Resident or Resident's Guests as provided by law, and to re-assign the bedroom space and/or apartment to others for use. Owner, in its sole reasonable discretion in accordance with applicable law, will have the right to determine when bedroom space and/or an apartment is abandoned, which may take into consideration any one of the following: the removal of personal property from the bedroom space other than in the usual course of continuing use, the failure to pay housing charges or other charges, discontinuance of any utility service, and failure to respond to any notices, phone calls, or correspondence from Owner or its representatives.

21. **Vacating at End of Term; Renewal.** This Agreement does not automatically renew, and Owner is not obligated to renew it. **AS PROVIDED IN CHICAGO RESIDENTIAL LANDLORD-TENANT ORDINANCE SECTION 5-12-130(j), OWNER HEREBY PROVIDES NOTICE OF ITS INTENT NOT TO RENEW RESIDENT'S OCCUPANCY at the end of the Term unless a new, separate Housing Agreement is mutually entered into by the parties.** Owner reserves the right to contract with others for the premises at any time, for occupancy commencing after the End Date. Upon termination or expiration of this Agreement for any reason, Resident will immediately vacate and relinquish the bedroom space and entire apartment, and all of Owner's fixtures, in a clean and sanitary condition, including removing all trash. Resident will pay all utility and service bills to the bedroom space and apartment (except those provided by Owner as specified herein) and cancel all utility accounts in the name of Resident. Resident will return to Owner all keys issued to Resident by Owner. If all keys issued to Resident are not returned promptly to Owner, Resident will pay all costs associated with re-keying or reprogramming locks for the bedroom space and/or apartment, along with the cost of replacement of keys. If Resident fails to vacate the bedroom space and apartment by the end of the Term or upon earlier termination of the Agreement, Resident will pay agreed holdover charges equal to three (3) times the daily pro-rated housing charges during the Term, plus associated expenses, including attorneys' fees as permitted by law. In no event after termination or expiration of this Agreement will it be deemed to have been renewed or extended.

22. **Security Deposit**. None. The parties agree (and Resident hereby acknowledges) that Owner has not charged or received any security deposit from Resident in connection with this Agreement. The Administrative Fee referenced on Page 1 of this Agreement is a non-refundable, one-time fee paid by Resident to reimburse Owner for its administrative and preparatory costs incurred in connection with this Agreement; the Administrative Fee is not intended and may not be construed to be a security deposit.

23. **Renewal of Residency**. If this Housing Agreement is a renewal of Resident's residency at the Property to follow the expiration of another valid agreement with an End Date that is no more than one day earlier than the Start Date of this Housing Agreement, then: (a) the Start Date of this Housing Agreement will be deemed to take place simultaneously with the expiration of the prior agreement, so that this Housing Agreement begins immediately upon the expiration of the term of the prior agreement; and (b) if Resident is assigned by Owner to a different apartment or bedroom for the new term under this Housing Agreement, Resident agrees to relocate promptly to the newly assigned space and to relinquish occupancy of the prior space on the date specified by Owner.

24. **Casualty Loss.** If in Owner's reasonable judgment the premises or the Property is materially damaged by fire or other casualty, Owner may terminate this Agreement within a reasonable time after such determination, by written notice to Resident, in which case Owner will refund prorated, pre-paid rent and all deposits less lawful deductions unless Resident and/or Resident's guest(s) caused the casualty, in which case all funds on account will be applied to all applicable charges related to the damages and Resident will be responsible for the balance of all charges for repairs. If following a fire or other casualty Owner does not elected to terminate this Agreement, Owner will rebuild the damaged areas within a reasonable time, and during such reconstruction, Resident will be provided a reasonable rent reduction for the unusable portion of the premises unless Resident and/or Resident's guest(s) caused the casualty. Unless Resident and/or Resident's guest(s) caused the casualty, Resident may terminate the Agreement without further obligation for rent by written notice to Owner if Owner does not return possession of the damaged areas or reasonable alternate accommodations to Resident within 60 days.

25. **Guarantor Information, Notice.** Owner reserves the right to notify any Guarantor of any action taken or notice given with regard to Resident under this Agreement. If Resident or Guarantor has supplied information by means of an application for residency, guaranty of payment or other documentation, Resident and Guarantor, as the case may be, represent that such information is true and correct and given voluntarily and knowingly. Owner and its management agent reserve the right to release any such information and/or Resident's account history to law enforcement, government officials, lenders and prospective purchasers of the Property.

26. **Subordination; Attornment**. This Agreement and Resident's rights are subject and subordinate to all present and future financings secured by the Property. Resident will attorn to the lender or any new owner of the Property following a foreclosure thereof.

27. **Modification.** This Agreement may not be modified, amended or revised except in writing signed by Resident and Owner or its authorized agent. If any provision of this Agreement is found to be unenforceable or inapplicable, then the remaining provisions will not be voided and will remain in full force and effect.

28. **Use of Likeness**. As part of the consideration for this Housing Agreement, Resident authorizes Owner and its affiliates to make photographs and video recordings of Resident in community and resident amenity areas, and irrevocably grants Owner and its

7 Sloane C Buxton 22 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

affiliates a royalty-free license to use Resident's image and likeness for all lawful purposes, including promotional purposes in advertising, video, web, social media and other formats.

**29**. **Multiple Bedroom Spaces.** If this Housing Agreement expressly identifies more than one bedroom space in a multi-bedroom apartment as assigned to Resident on page 1, then: (a) references to a "space" or "spaces" will be deemed to refer to all of the spaces assigned to Resident, or to the entire apartment if all of the bedrooms in an apartment are assigned to Resident; and (b) if Resident is assigned fewer than all of the bedroom spaces in an apartment, use of common areas will continue to be shared with other residents of the apartment and any calculation of Resident's share of any charges assessed pro rata to all residents of an apartment will be made by dividing the number of bedroom spaces assigned to Resident by the total number of occupied bedroom spaces within the apartment.

**30. DISPUTE RESOLUTION; MANDATORY ARBITRATION; CLASS-ACTION WAIVER.**

(a) Claims Subject to Arbitration. Except as expressly provided below, the parties agree that to the fullest extent permitted by applicable law, any dispute arising out of or relating in any way to this Agreement or a similar prior agreement, the Property or the relationship between Resident and Owner or Manager (including matters occurring prior to the date of this Agreement and disputes also involving third parties) (collectively, "Claims") will, at the election of either party, be resolved by arbitration, including any dispute about arbitrability, such as scope and enforceability.

(b) Arbitration Process. Any arbitration will be conducted pursuant to the applicable rules (the "Arbitration Rules") of the American Arbitration Association, as modified herein, to the extent such modifications are not prohibited by the Arbitration Rules. The arbitration will be conducted in Chicago, Illinois. The parties will select a single arbitrator, but in the event that the parties are unable to agree, the arbitrator will be appointed pursuant to the Arbitration Rules. The arbitrator will be a practicing attorney with significant expertise in litigating and/or presiding over cases involving the substantive legal areas involved in the dispute. The parties to the arbitration will not request, and the arbitrator will not order, that any discovery be taken or provided, including depositions, interrogatories or document requests, except to the extent the amount in controversy exceeds $50,000. The arbitration will be concluded within three months of the date the arbitrator is appointed. The arbitrator's findings, reasoning, decision, and award will be stated in writing and based upon applicable law. Judgment on the arbitration award may be entered in any court having jurisdiction. In the event that the arbitration results in an award which imposes an injunction or contains a monetary award in excess of $100,000, the award will be reviewable on appeal initiated by filing notice of appeal with the AAA office within 30 days of the award, governed by the AAA Optional Appellate Arbitration Rules and conducted by a panel of three new arbitrators, ruling by majority, under the procedure for appointment from the national roster of arbitrators. Unless the applicable Arbitration Rules require otherwise, arbitration fees and costs will be shared equally by the claimant(s) and respondent(s), respectively, in any arbitration proceeding. Should the AAA be unavailable, unable or unwilling to accept and administer the arbitration of any claim under these arbitration provisions as written, the parties will agree on a substitute arbitration organization, such as JAMS, that will enforce the arbitration provisions as written. *Because this Agreement memorializes a transaction in interstate commerce, the Federal Arbitration Act governs the interpretation and enforcement of these arbitration provisions. More information about arbitration, including the Arbitration Rules, is available at www.adr.org or by calling 1-800-778-7879.*

(c) Claims Excluded from Arbitration. The following matters will not be subject to arbitration but will instead be adjudicated in the courts of Cook County, Illinois or such other court in which jurisdiction and venue are proper: (a) an action for possession or for injunctive remedies provided under applicable landlord-tenant laws or to enforce intellectual property rights; (b) a suit by Owner or its assignee for collection of amounts owed by Resident under this Agreement; and (c) any claim or dispute for which applicable law (as determined by a binding court decision) or the applicable arbitration rules do not permit arbitration and require adjudication in a specific civil court. Matters within the jurisdiction of an applicable small claims court may also be brought in that court in lieu of arbitration.

(d) Right to Opt Out of Arbitration. RESIDENT MAY OPT OUT OF THE FOREGOING ARBITRATION PROVISIONS BY SENDING EXPRESS WRITTEN NOTICE (VIA CERTIFIED US MAIL OR RECOGNIZED COURIER SERVICE) ELECTING TO OPT OUT OF ARBITRATION PROVISIONS, WITHIN 30 DAYS OF RESIDENT'S EXECUTION OF THIS AGREEMENT, to: The Scion Group, Attn: Legal Department, 444 N. Michigan Ave., Suite 2600, Chicago IL 60611. Resident will continue to be bound by any other arbitration provision Resident did not out opt of.

(e) Applicable Law; Attorney Fees. All claims and disputes, including those adjudicated in arbitration or in court, will be governed by the internal laws of the State of Illinois with respect to contracts made or events occurring therein. Unless prohibited by applicable law, the substantially prevailing party in any dispute between the parties (including in arbitration) may recover their reasonable costs and fees incurred in connection with such matter, including reasonable attorneys' fees.

(f) Class Action Waiver. **THE PARTIES AGREE THAT ANY CLAIMS WILL BE ADJUDICATED ON AN INDIVIDUAL BASIS, AND EACH WAIVES THE RIGHT TO PARTICIPATE IN A CLASS, COLLECTIVE, PAGA, OR OTHER JOINT ACTION WITH RESPECT TO THE CLAIMS.**

8 Sloane C Buxton 23 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

(g) Waiver of Jury Trial. **THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A JURY TRIAL FOR CLAIMS NOT SUBJECT TO ARBITRATION, WHICH WILL BE ADJUDICATED BY A JUDGE ONLY.**

(h) Severability and Survival. To the extent any provision of this paragraph 30 is found to be unenforceable, it will be severed so the parties' intent to arbitrate will survive and arbitration will proceed without such provision; provided that if the class-action waiver is found unenforceable for any reason, the arbitration provisions of this paragraph 30 will be void. All of the terms and provisions of this paragraph 30 will survive the termination or expiration of this Agreement.

**31. Miscellaneous.** Failure of Owner to insist upon strict compliance with the terms of this Agreement will not constitute a waiver of Owner's rights to act on any violation. Owner's rights are cumulative and the exercise of any remedy by Owner will not exclude or waive the right to exercise any other right or remedy. Time is of the essence in the performance of this Agreement. Owner and its agents and affiliates make no representations or warranty as to the character or standing of any other residents of the Property. This Agreement and any attached and signed addenda constitute the entire agreement between the parties and no oral statements will be binding. Any amendment to this Agreement, other than a change to the Community Policies, must be in writing and signed by Resident and Owner or its authorized agent. If any provision of this Agreement requires the permission or consent of Owner, such written permission or consent may be granted or withheld in the sole discretion of Owner or its designated agent or representative, or may contain such conditions as Owner deems appropriate and will be effective only if Resident complies with such conditions; any such permission or consent given by Owner to Resident may be modified, revoked or withdrawn by Owner at any time, upon reasonable written notice to Resident, as Owner reasonably determines is necessary for the protection of safety, property or welfare of residents or personnel of the Property. If any provision of this Agreement is found to be unenforceable or inapplicable, then the remaining provisions will not be voided and will remain in full force and effect. **Resident acknowledges receipt of summaries of the Chicago Residential Landlord and Tenant Ordinance, included on pages 10-14.** The "Rate of Interest on Security Deposits" summary is provided only to the extent required by law, although there is no security deposit under this Agreement.

***SIGNATURES ARE ON PAGE 1***

*Ion Lincoln Park is an Equal Opportunity housing provider.*

9 Sloane C Buxton 24 Joshua Sulloway

FILED DATE: 9/29/2022 9:29 AM 2022CH09059

# *Chicago* Rents Right

Good Tenants, Good Landlords, Great Neighborhoods!

For more information, please call 312-742-RENT(7368)

10 Sloane C Buxton 25 Joshua Sulloway 10

FILED DATE: 9/29/2022 8:09 AM 2022CH09059

Lori E. Lightfoot
Mayor of Chicago

# CITY OF CHICAGO RESIDENTIAL LANDLORD AND TENANT ORDINANCE SUMMARY

DOH
Department of Housing

**At initial offering, this Summary of the ordinance must be attached to every written rental agreement and also upon initial offering for renewal. The Summary must also be given to a tenant at initial offering of an oral agreement, whether the agreement is new or a renewal. Unless otherwise noted, all provisions are effective as of November 6, 1986. {Mun. Code Ch. 5-12-170}**

**IMPORTANT: IF YOU SEEK TO EXERCISE RIGHTS UNDER THE ORDINANCE, OBTAIN A COPY OF THE ENTIRE ORDINANCE TO DETERMINE APPROPRIATE REMEDIES AND PROCEDURES. CONSULTING AN ATTORNEY WOULD ALSO BE ADVISABLE. FOR A COPY OF THE ORDINANCE, VISIT THE CITY CLERK'S OFFICE ROOM 107, CITY HALL, 121 N. LASALLE, CHICAGO, ILLINOIS.**

## IMPORTANT NOTICE

**A message about porch safety:** The porch or deck of this building should be designed for a live load of up to 100 lbs. per square foot, and is safe only for its intended use. Protect your safety. Do not overload the porch or deck. If you have questions about porch or deck safety, call the City of Chicago non-emergency number, 3-1-1.

## WHAT RENTAL UNITS ARE COVERED BY THE ORDINANCE? {MUN. CODE CH. 5-12-010 & 5-12-020}

- Rental units with written or oral leases (including all subsidized units such as CHA, IHDA, Section 8 Housing Choice Vouchers, etc.)

**EXCEPT**

- Units in owner occupied buildings with six or fewer units.
- Units in hotels, motels, rooming houses, unless rent is paid on a monthly basis and unit is occupied for more than 32 days.
- School dormitory rooms, shelters, employee's quarters, non-residential rental properties.
- Owner occupied co-ops and condominiums.

## WHAT ARE THE TENANT'S GENERAL DUTIES UNDER THE ORDINANCE? {MUN. CODE CH. 5-12-040}

The tenant, the tenant's family and invited guests must comply with all obligations imposed specifically upon tenants by provision of the Municipal Code, applicable to dwelling units, including section 7-28-859:

- Buying and installing working batteries in smoke and carbon monoxide detectors within tenant's apartment.
- Keeping the unit safe and clean.
- Using all equipment and facilities in a reasonable manner.
- Not deliberately or negligently damaging the unit.
- Not disturbing other residents.

## LANDLORD'S RIGHT OF ACCESS {MUN. CODE CH. 5-12-050}

- A tenant shall permit reasonable access to a landlord upon receiving two days notice by mail, telephone, written notice or other means designed in good faith to provide notice.
- A general notice to all affected tenants may be given in the event repair work on common areas or other units may require such access.
- In the event of emergency or where repairs elsewhere unexpectedly require access, the landlord must provide notice within two days after entry.

## SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081}

- A landlord must give a tenant a receipt for a security deposit including the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
- However, if the security deposit is paid by means of an electronic funds transfer, the landlord has the option to give an electronic receipt. The electronic receipt must describe the dwelling unit, state the amount and date of the deposit, and have an electronic or digital signature. (eff. 10-8-10)
- However, the landlord may accept the payment of the first month's rent and the security deposit in one check or one electronic funds transfer and deposit such rent and security deposit into one account, if the landlord within 5 days of such acceptance transfers the security deposit into a separate account. (eff. 10-8-10)
- A landlord must hold all security deposits in a federally insured interest-bearing account in a financial institution located in Illinois. Security deposits and interest thereon shall not be commingled with the assets of the landlord.
- A written rental agreement must specify the financial institution where the security deposit will be deposited. If there is no written rental agreement, the landlord must in writing provide such information to the tenant within 14 days of the receipt of the security deposit. If the security deposit is transferred to another financial institution, the landlord must notify the tenant within 14 days of the transfer the name and address of the new financial institution. (eff. 10-8-10)

11 Sloane C Buxton 26 Joshua Sulloway

FILED DATE: 9/29/2022 9:28 AM 2022CH09059

**SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081} (cont.)**

- A landlord must pay interest each year on security deposits and prepaid rent held more than six months. (eff. 1-1-92)
- The rate of interest a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before expenses for damages can be deducted from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- A landlord must return all security deposits and required interest, if any, minus unpaid rent and expenses for damages, within 45 days from the date the tenant vacates the unit.
- In the event of a fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)
- In the event of a sale or any other disposition of residential real property by a landlord, the successor landlord is liable to the tenant for any security deposit or prepaid rent paid to the original landlord. The successor landlord must notify the tenant, in writing, within 14 days from the disposition that the deposit or prepaid rent was transferred to the successor landlord. The original landlord remains liable for the deposit or prepaid rent until the original landlord transfers the deposit or prepaid rent to the successor landlord and provides proper notice of such transfer to the tenant. (Mun. Code Ch. 5-12-080 (e) eff. 5-18-10)
- Subject to correcting a deficient amount of interest paid to a tenant on a security deposit if a landlord fails to comply with specified security deposit requirements the tenant shall be awarded damages in an amount equal to two times the security deposit plus interest. (eff. 10-8-10)

**WHAT ARE THE LANDLORD'S GENERAL DUTIES UNDER THE ORDINANCE?**

- To give tenant written notice of the owner's or manager's name, address and telephone number. {Mun. Code Ch. 5-12-090}
- Within seven (7) days of being served a foreclosure complaint an owner or landlord of a premises that is the subject of the foreclosure complaint shall disclose, in writing, to all tenants of the premises that a foreclosure action has been filed. The owner or landlord shall also notify of a foreclosure suit, in writing, before a tenant signs a lease.
  {Mun. Code Ch. 5-12-095 eff.11-05-08}
- To give new or renewing tenants notice of:
  1) Code citations issued by the City in the previous 12 months;
  2) Pending Housing Court or administrative hearing actions;
  3) Water, electrical or gas service shut-offs to the building during entire occupancy. {Mun. Code Ch. 5-12-100}
- To maintain the property in compliance with all applicable provisions of the Municipal Code. {Mun. Code Ch. 5-12-070}
- To not require a tenant to renew an agreement more than 90 days before the existing agreement terminates. (eff. 1-1-92)
  {Mun. Code Ch. 5-12-130 (i)}
- If the rental agreement will not be renewed, or if the rental rate will be increased, to provide a tenant with at least 30 days if the tenant has occupied the apartment for up to six months; 60 days if the tenant has occupied the apartment for more than six months and up to three years; and 120 days if the tenant has occupied the apartment for more than three years. (eff. 7-28-20) {Mun. Code Ch. 5-12-130 (j)}
- To not enforce prohibited lease provisions. {Mun. Code Ch. 5-12-140}
- Bed Bugs-Education. For any rental agreement for a dwelling unit entered into or renewed after the effective date of this 2013 amendatory ordinance, prior to entering into or renewing such agreement, the landlord or any person authorized to enter into such agreement on his behalf shall provide to such tenant the informational brochure on bed bug prevention and treatment prepared by the department of health pursuant to section 7-28-860. {Mun. Code Ch. 5-12-101}

**TENANT REMEDIES {MUN. CODE CH. 5-12-110}**

Minor Defects

- If the landlord fails to maintain the property in compliance with the Code and the tenant or the tenant's family or guests are not responsible for the failure, the tenant may:
  1) Request in writing that the landlord make repairs within 14 days, and if the landlord fails to do so the tenant may withhold an amount of rent that reasonably reflects the reduced value of the unit. Rent withholding begins from the fifteenth day until repairs are made; OR
  2) Request in writing that the landlord make repairs within 14 days and if the landlord fails to do so the tenant may have the repairs made and deduct up to $500 or 1/2 of the month's rent, whichever is more, but not to exceed one month's rent. Repairs must be done in compliance with the Code. Receipt for the repairs must be given to the landlord and no more than the cost of the repairs can be deducted from the rent; and also
  3) File suit against the landlord for damages and injunctive relief.

Major Defects

- If the landlord fails to maintain the property in compliance with the Code, and the failure renders the premises not reasonably fit and habitable, the tenant may request in writing that the landlord make repairs within 14 days. If after 14 days repairs are not made, the tenant may immediately terminate the lease. Tenant must deliver possession and move out in 30 days or tenant's notice is considered withdrawn.
  (eff. 1-1-92)

**FAILURE TO PROVIDE ESSENTIAL SERVICES (HEAT, RUNNING OR HOT WATER, ELECTRICITY, GAS OR PLUMBING) {MUN. CODE CH. 5-12-110(f)}**

- If, contrary to the lease, an essential service is not provided, or if the landlord fails to maintain the building in material compliance with the Code to such an extent that such failure constitutes an immediate danger to the health and safety of the tenant, and the tenant or tenant's family or guests are not responsible for such failure, after giving written notice, the tenant may do ONE of the following:
  1) Procure substitute service, and upon presenting paid receipts to the landlord, deduct the cost from the rent; OR
  2) File suit against the landlord and recover damages based on the reduced value of the dwelling unit; OR
  3) Procure substitute housing and be excused from paying rent for that period. The tenant may also recover from the landlord the cost of substitute housing up to an amount equal to the monthly rent for each month or portion thereof; OR
  4) Request that the landlord correct the failure within 24 hours and if the landlord fails to do so, withhold the monthly rent an amount that reason-

12 Sloane C Buxton 27 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

ably reflects the reduced value of its premises. Rent withholding cannot start until after the 24 hours expires and applies only to days past the 24-hour waiting period; OR (eff. 1-1-92)

5) Request that the landlord correct the failure within 72 hours and if the landlord fails to do so, terminate the rental agreement. If the rental agreement is terminated, the tenant must deliver possession and move out within 30 days or the notice of termination is considered withdrawn. (eff. 1-1-92)

**Note: Remedies 4) and 5) may not be used if the failure is due to the utility provider's failure to provide service**. For the purposes of this section only, the notice a tenant provides must be in writing, delivered to the address the landlord has given the tenant as an address to which notices should be sent. If the landlord does not inform the tenant of an address, the tenant may deliver written notice to the last known address of the landlord or by any other reasonable means designed in good faith to provide written notice to the landlord. (eff.1-1-92)

**FIRE OR CASUALTY DAMAGE {MUN. CODE CH. 5-12-110 (g)}**

- If a fire damages the unit to an extent that it is in material noncompliance with the Code and the tenant, tenant's family or guests are not responsible for the fire or accident, the tenant may:

1) Move out immediately, but if this is done, the tenant must provide written notice to the landlord of the intention to terminate within 14 days after moving out.
2) The tenant may stay in the unit, if it is legal, but if the tenant stays and cannot use a portion of the unit because of damage, the rent may be reduced to reflect the reduced value of the unit.
3) If the tenant stays, and the landlord fails to diligently carry out the work, the tenant may notify the landlord, in writing, within 14 days after the tenant becomes aware that the work is not being diligently carried out, of the tenant's intention to terminate the rental agreement and move out.

**SUBLEASES {MUN. CODE CH. 5-12-120}**

- The landlord must accept a reasonable subtenant offered by the tenant without charging additional fees.
- If a tenant moves prior to the end of the rental agreement, the landlord must make a good faith effort to find a new tenant at a fair rent.
- If the landlord is unsuccessful in re-renting the unit, the tenant remains liable for the rent under the rental agreement, as well as the landlord's cost of advertising.

**WHAT HAPPENS IF A TENANT PAYS RENT LATE? {MUN. CODE CH. 5-12-140 (h)}**

- If the tenant fails to pay rent on time, the landlord may charge a late fee of $10.00 per month on rents under $500 plus 5 percent per month on that part of the rent that exceeds $500.00 (i.e., for a $450.00 monthly rent the late fee is $10.00, for a $700 monthly rent the late fee is $10 plus 5% of $200.00 or $20.00 total) (eff. 1-1-92)

**WHAT HAPPENS IF A TENANT PAYS RENT DUE AFTER THE EXPIRATION OF THE TIME PERIOD SET FORTH IN A TERMINATION NOTICE? {MUN. CODE CH. 5-12-140 (g) CH. 5-12-130 (g)}**

- If the landlord accepts the rent due knowing that there is a default in payment, the tenant may stay.

**LANDLORD REMEDIES {MUN. CODE CH. 5-12-130}**

- If the tenant fails to pay rent, the landlord, after giving five days written notice to the tenant, may terminate the rental agreement. However, the tenant may remain in the unit with a rental agreement in good standing if the tenant pays the full amount of back rent and landlord court filing fees before a judge issues an order of possession. If, however, the tenant uses this provision and later receives a second written notice of nonpayment, the tenant will have only five days to pay unpaid rent.
- If the tenant fails to comply with the Code or the rental agreement, the landlord, after giving 10 days written notice to the tenant, may terminate the rental agreement if tenant fails to correct the violation.
- If the tenant fails to comply with the Code or the rental agreement, the landlord may request in writing that the tenant comply as promptly as conditions permit in the case of emergency, or within 14 days. If the breach is not corrected in the time period specified, the landlord may enter the dwelling unit and have the necessary work done. In this case, the tenant shall be responsible for all costs of repairs.

**LOCKOUTS {MUN. CODE CH. 5-12-160}**

This section applies to every residential rental unit in Chicago. There are no exceptions.

- It is illegal for a landlord to lock out a tenant, or change locks, or remove doors of a rental unit, or cut off heat, utility or water service, or to do anything which interferes with the tenant's use of the apartment.
- All lockouts are illegal and the Police Department is responsible for enforcement against such illegal activity. (eff. 1-1-92) (Police Special Order 93-12)
- The landlord shall be fined $200 to $500 for each day the lockout occurs or continues.
- The tenant may sue the landlord to recover possession of the unit and twice the actual damages sustained or two months' rent, whichever is greater.

**PROHIBITION ON RETALIATORY CONDUCT BY LANDLORD {MUN. CODE CH. 5-12-150}**

- A tenant has the right to complain or testify in good faith about their tenancy to governmental agencies or officials, police, media, community groups, tenant unions or the landlord. A landlord is prohibited from retaliating by terminating or threatening to terminate a tenancy, increasing rent, decreasing services, bringing or threatening to bring an eviction action, or refusing to renew a lease agreement.

**ATTORNEY'S FEES {MUN. CODE CH. 5-12-180}**

- Except in eviction actions, the prevailing plaintiff in any action arising from the application of this Ordinance shall be entitled to recover all court costs and reasonable attorney's fees. (eff. 1-1-92)

**WHERE CAN I GET A COPY OF THE ORDINANCE?**

- For a copy of the Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 North LaSalle Street, Chicago, Illinois or view it at the Municipal Reference Library, Harold Washington Library, 5th Floor, 400 S. State Street, Chicago, Illinois.

*Approved by the City of Chicago, June 2013; Summary Revised 2020*

11250-12

13 Sloane C Buxton

28 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

# Residential Landlord and Tenant Ordinance

*Rate of Interest on Security Deposits*

*Municipal code chapters 5-12-080, 5-12-081 and 5-12-170*

- A landlord must give a tenant a receipt for a security deposit that includes the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
- A landlord must pay interest each year on security deposits (eff. 11-6-86) and prepaid rent (eff. 1-1-92) held more than six months.
- The rate of interest that a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before a landlord can deduct expenses for damages from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- Within 45 days of the date the tenant vacates the dwelling unit, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages.
- In the event of fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)

Under Chapter 5-12 of the Municipal Code of Chicago sections 5-12-081 and 5-12-082, the City Comptroller shall calculate and announce on the first business day of each year, the rate of interest to be paid on security deposits. As of Jan. 1, 2020, based on information from the City Comptroller's Office, the interest rate to be paid on security deposits is 0.01%.

The rate is based upon the average of the rates of interest of the following types of accounts at Chase Bank, which is the commercial bank having the most branches located in the City of Chicago: Savings Account 0.01 percent, insured Money Market 0.01 percent and Six-month Certificate of Deposit (based on a deposit of $1,000) 0.01 percent.

**Security Deposit Interest Rate**
Jan. 1-Dec. 31, 2020: 0.01%

| | | |
|---|---|---|
| 2015 to 2019: 0.01% | 2008: 1.26% | 2001: 3.10% |
| 2014: 0.013% | 2007: 1.68% | 2000: 2.71% |
| 2013: 0.023% | 2006: 1.71% | 1999: 2.63% |
| 2012: 0.057% | 2005: 1.01% | 1997: 3.38% |
| 2011: 0.073% | 2004: 0.42% | Pre-July 1997: 5% |
| 2010: 0.073% | 2003: 0.52% | |
| 2009: 0.12% | 2002: 0.83% | |

For a copy of the complete Residential Landlord and Tenant Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 N. LaSalle St. For a copy of the Residential Landlord and Tenant Ordinance Summary, visit the Department of Housing, City Hall, Room 1006.

14 Sloane C Buxton 29 Joshua Sulloway

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

# Ordenanza de Residencias para Duenos e Inquilinos (Arrendatrios)

***Tarifa de Interes en Depositos de Seguridad***

*Codigo Municipal, Capitulo 5-12-080, 5-12-081 y 5-12-170*

- El dueño del edificio (propietario) debe darle a su inquilino (arrendatario) un recibo por Depósito de Seguridad que incluya el nombre de la persona, la fecha cuando fue recibido y la descripción de la unidad (casa) que esta rentando. El recibo debe ser firmado por la persona aceptando el depósito de seguridad.
- El dueño del edificio debe pagar interes cada año en el depósito de seguridad (eff. 11-6-86) y renta en Ia prepagada (eff. 1-1-92) retenida por más de seis meses.
- La tarifa de interés que el dueño del edificio debe pagar es fijada cada año por el Controlador de la Ciudad. (eff. 7-1-97).
- Antes que el dueño del edificio pueda deducir los gastos por daños del deposito de seguridad, el dueño del edificio deberá proporcionar a su inquilino (arrendatario) una declaración detallada de los articulos dañados, dentro de los 30 dias de Ia fecha que el inquilino (arrendatario) deje vacante la unidad que rentaba.
- Dentro de los 45 dias de la fecha que el inquilino (arrendatario) deje vacante la unidad o casa, el dueño del edificio deberá devolver todos los depósitos de seguridad y el interés requerido, si lo hay, menos Ia renta sin pagar y los gastos por los daños.
- En el evento de fuego, el dueño del edificio deberá devolver todos los depósitos de seguridad y el interés requerido, si lo hay, menos la renta sin pagar y los gastos por daños, dentro de los siete dias en que el inquilino (arrendatario) proporcionó notificación de terminación del acuerdo de renta. (eff. 1-1-92)

Bajo el Capitulo 5-1 2 del Codigo Municipal de Chicago, secciones 5-12-081 y 5-12-082, el controlador de la Ciudad debera calcular y anunciar con el primer día de negocios de cada año, la tarifa de interés con la que los depósitos de seguridad serán pagados. Empezando Enero 1, del 2020 basado en la información de la Oficina del Controlador (City Comptroller's Office), la tarifa de interés en depósitos de seguridad es de 0.01 por ciento. Esta tarifa esta basada en un promedio del interés de las cuentas de ahorros regulares de los siguientes tipos de cuentas de Chase Bank, **el cual es el banco comercial que tiene mas sucursales localizadas en la Ciudad de Chicago**: Libras de Ahorros 0.01 por ciento; Dinero Asegurado por la Bolsa 0.01 por ciento; y Certificado de Deposito por seis meses (basado en depósitos de $1,000) 0.01 por ciento.

**Tarifa de Interes Deposito de Seguridad**
Enero 1-Diciembre 31, 2020: 0.01%

| | | |
|---|---|---|
| 2015 - 2019: 0.01% | 2008: 1.26% | 2001: 3.10% |
| 2014: 0.013% | 2007: 1.68% | 2000: 2.71% |
| 2013: 0.023% | 2006: 1.71% | 1999: 2.63% |
| 2012: 0.057% | 2005: 1.01% | 1997: 3.38 % |
| 2011: 0.073% | 2004: 0.42% | Antes de Julio 1997: |
| 2010: 0.073% | 2003: 0.52% | 5% |
| 2009: 0.12% | 2002: 0.83% | |

Para una copia de la Ordenanza de Residencias para Dueños e Inquilinos, visite la oficina del City Clerk, Cuarto 107, 121 N. LaSalle St. Para una copia del resumen de la Ordenanza de Residencias para Dueños e Inquilinos, visite DOH, 121 N. LaSalle St., Cuarto 1006.

FILED DATE: 9/29/2022 9:28 AM 2022CH09059

# CONCESSION ADDENDUM

This Concession Addendum is entered into on Apr 01, 2022 between Sloane C Buxton **(Resident")** and **1237 Fullerton LLC d/b/a "Ion Lincoln Park"** ("**Owner**") and is binding only when signed by Owner or its agent.

Resident's Housing Agreement covering the term of September 01, 2022 to August 10, 2023, is amended to provide a total sale price concession of $960.00. This concession will be applied equally as a credit of $80.00 against each installment. Resident will pay the installment payments specified in the Housing Agreement less the per-installment credit amount.

All other provisions of the Housing Agreement remain in effect and unchanged. As consideration for this Concession Addendum, Resident agrees that if the Housing Agreement is terminated for any reason prior to the End Date or all net amounts due under the Housing Agreement are not paid as and when due, the entire concession will become void and must be repaid.

SEE BELOW FOR ELECTRONIC SIGNATURE
Signature of Resident

**ACCEPTANCE BY OWNER:**

**1237 Fullerton LLC**
**d/b/a "Ion Lincoln Park"**

**By:** SEE BELOW FOR ELECTRONIC SIGNATURE
**Authorized Agent**

[1] Sloane C Buxton [2] Joshua Sulloway

FILED DATE: 9/29/2022 8:09 AM 2022CH09059

# Ion Lincoln Park Housing Agreement

## Signature Details

| | Signer | IP Address | Date Signed |
|---|---|---|---|
| | **2022-23 Housing Agreement - Ion Lincoln Park** | | |
| **1** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **2** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **3** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **4** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **5** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **6** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **7** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **8** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **9** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **10** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **11** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **12** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **13** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **14** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **15** | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:41 PM |
| **16** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **17** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| **18** | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |

FILED DATE: 9/29/2022 8:09 AM 2022CH09059

| | | | |
|---|---|---|---|
| 19 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 20 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 21 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 22 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 23 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 24 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 25 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 26 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 27 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 28 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 29 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| 30 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:23 PM |
| | **Concession Addendum** | | |
| 1 | **Sloane C Buxton**<br>Primary (15328049) | 75.102.214.145 | 04/19/2022 01:21:40 PM |
| 2 | **Joshua Sulloway**<br>Owner/Manager | 52.124.37.146 | 04/26/2022 12:29:27 PM |

FILED DATE: 9/29/2022 9:09 AM 2022CH09059

**EXHIBIT 2**

Hearing Date: 8/29/2022 11:00 AM
Location: Court Room 2302
Judge: Moreland, Caroline Kate

FILED
4/29/2022 8:08 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH04059
Calendar, 10
17699197

FILED DATE: 4/29/2022 8:08 AM 2022CH04059

**Chancery Division Civil Cover Sheet**
**General Chancery Section**

**(12/01/20) CCCH 0623**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

BUXTON, SLOANE

Plaintiff

v.

THE SCION GROUP LLC and 1237 FULLERTON LLC

Defendant

Case No: 2022CH04059

**CHANCERY DIVISION CIVIL COVER SHEET**
**GENERAL CHANCERY SECTION**

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

- 0005 ☐ Administrative Review
- 0001 ☐ Class Action
- 0002 ☐ Declaratory Judgment
- 0004 ☐ Injunction

- 0007 ☑ General Chancery
- 0010 ☐ Accounting
- 0011 ☐ Arbitration
- 0012 ☐ Certiorari
- 0013 ☐ Dissolution of Corporation
- 0014 ☐ Dissolution of Partnership
- 0015 ☐ Equitable Lien
- 0016 ☐ Interpleader

- 0017 ☐ Mandamus
- 0018 ☐ Ne Exeat
- 0019 ☐ Partition
- 0020 ☐ Quiet Title
- 0021 ☐ Quo Warranto
- 0022 ☐ Redemption Rights
- 0023 ☐ Reformation of a Contract
- 0024 ☐ Rescission of a Contract
- 0025 ☐ Specific Performance
- 0026 ☐ Trust Construction
- 0050 ☐ Internet Take Down Action (Compromising Images)

☐ Other (specify) ____________________

◉ Atty. No.: 48317 ○ Pro Se 99500

Atty Name: JS LAW

Atty. for: PLAINTIFF

Address: 29 E. MADISON ST., STE. 1201

City: CHICAGO State: IL

Zip: 60602

Telephone: 312.756.1330

Primary Email: JEFFS@JSSLAWOFFICES.COM

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: ____________________

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 1